# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## JACKSON DIVISION

NEVADA PARTNERS FUND, LLC, by
and through SAPPHIRE II, INC., the
tax matters partner                                                    **PLAINTIFF**

VS.                                    CIVIL ACTION NO. 3:06cv379-HTW-MTP
                                       And Member Cases:
                                       3:06-cv-384 HTW-MTP
                                       3:06-cv-385 HTW-MTP
                                       3:06-cv-386 HTW-MTP
                                       3:06-cv-387 HTW-MTP
                                       3:06-cv-380 HTW-MTP
                                       3:06-cv-381 HTW-MTP
                                       3:06-cv-382 HTW-MTP
                                       3:06-cv-388 HTW-MTP
                                       3:06-cv-389 HTW-MTP
                                       3:06-cv-390 HTW-MTP

UNITED STATES OF AMERICA                                               **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

Before this court is a federal income tax partnership proceeding tried to the court

sitting without a jury between the dates of August 3, 2009, and September 23, 2009.

Now, pursuant to Rule 52,[1] Federal Rules of Civil Procedure, this court announces its

findings of fact and conclusions of law.

This lawsuit was brought by Nevada Partners Fund, LLC, by and through its tax

matters partner, Sapphire II, Inc. Nevada Partners Fund, a limited liability corporation,

_____

[1]Rule 52(a)(1) of the Federal Rules of Civil Procedure provides that, "[i]n an action tried
on the facts without a jury ..., the court must find the facts specifically and state its conclusions
of law separately."

is principally owned (99%) by James Kelley Williams.  Sapphire II, Inc., is the tax matters partner, whose presence here is required by tax law.  A "tax matters partner" is defined as a general partner who is so designated by the applicable tax regulations and is the entity to whom the Internal Revenue Service is required to mail notice of any final partnership administrative adjustments.  Title 26 U.S.C. § 6223(a).  *See also* Title 26 U.S.C. § 6231(a) (7) and  Treas. Reg. § 301.6231(a)(7)-1.

Plaintiff Nevada Partners Fund, LLC, submits this action pursuant to Title 26 U.S.C. § 6226(a)[2] which allows an aggrieved taxpayer entity to contest a final partnership administrative adjustment (FPAA) finding by the Internal Revenue Service ("IRS").  Under § 6226(a), the United States District Court for the District in which the partnership's principal place of business is located is a proper venue for this lawsuit. The parties do not contest this court's subject matter jurisdiction to hear this dispute.

This dispute between Nevada Partners Fund, LLC, and the United States of America, namely, the IRS, incorporates ten (10) additional member cases brought on behalf of three Limited Liability Companies (LLC's),[3] Nevada Partners Fund, LLC,

---

[2]Section 6226(a) provides that, "[w]ithin 90 days after the day on which a notice of a final partnership administrative adjustment is mailed to the tax matters partner, the tax matters partner may file a petition for a readjustment of the partnership items for such taxable year with – (1) the Tax Court, **(2) the district court of the United States for the district in which the partnership's principal place of business is located**, or (3) the Court of Federal Claims. Sapphire II asserts that its location and principal place of business is 2030 Eastover Drive, Jackson, Mississippi.

[3]The Internal Revenue Service defines a Limited Liability Company (LLC) as a business structure allowed by state statute similar to a Chapter S corporation, where the owners have limited personal liability for the debts and actions of the LLC. LLCs function like a partnership, providing management flexibility and the benefit of pass-through taxation.  The federal government does not recognize an LLC as a classification for federal tax purposes, so, an LLC business entity must file either as a corporation, a partnership or as a sole proprietorship on its tax return.  *See* www.irs.gov/business/small.

Carson Partners Fund, LLC, and Reno Partners Fund, LLC, by the owners of these LLC's just prior to their being purchased by James Kelley Williams.  All the plaintiffs in the instant case and the member cases challenge certain FPAAs setting forth adjustments to their LLC tax returns for the taxable year ending December 31, 2001, for tax periods between December 4, 2001, and the end of the year.

The ten (10) member cases accompanying the instant lawsuit are listed below. Each one of the cases challenges an IRS adjustment for a specific time period.  These time periods also are listed below.

Reno Partners Fund, LLC v. United States of America, 3:06-cv-00384-HTW-MTP;

Carson Partners Fund, LLC v. United States of America, 3:06-cv-00385-HTW-MTP;

Reno Partners Fund, LLC v. United States of America,  3:06-cv-00386-HTW-MTP

Nevada Partners Fund, LLC v. United States of America, 3:06-cv-00387-HTW-MTP

Carson Partners Fund, LLC v. United States of America, 3:06-cv-00380-HTW-MTP

Reno Partners Fund, LLC v. United States of America, 3:06-cv-00381-HTW-MTP

Carson Partners Fund, LLC v. United States of America, 3:06-cv-00382-HTW-MTP

Nevada Partners Fund, LLC v. United States of America, 3:06-cv-00388-HTW-MTP

Reno Partners Fund, LLC v. United States of America, 3:06-cv-00389-HTW-MTP

Carson Partners Fund, LLC v. United States of America, 3:06-cv-00390-HTW-MTP

All eleven cases challenge the manner in which the IRS has applied Treasury Regulation § 1.701-2,[4] the Partnership Anti-Abuse Rule to the plaintiffs' tax returns in

---

[4]Treasury Regulation § 1.701-2 provides in relevant part:  The provisions of subchapter K and the regulations thereunder must be applied in a manner that is consistent with the intent of subchapter K as set forth in paragraph (a) of this section (intent of subchapter K). Accordingly, *if a partnership is formed or availed of in connection with a transaction a principal*

this case.  Treasury Regulation § 1.701-2, is an anti-abuse regulation which protects partnership Subchapter K provisions from being abused by the principals of partnerships and/or purchasers of partnerships.  If a partnership is formed or availed of in connection with a transaction a principal purpose of which is to reduce substantially the present value of a partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K, the IRS will, pursuant to this regulation, recast the transaction to produce tax.  In this case the IRS, based on the manner in which James Kelley Williams availed himself of the Nevada/Carson/Reno partnership for the reduction of his 2001 tax liability, has recast the transaction to produce tax results.[5]  Consequently, plaintiff herein and the plaintiffs of the ten (10) member lawsuits have sued the IRS, arguing that the IRS has wrongfully adjusted taxes for the LLCs.

The specific time periods for which ten (10) member cases challenge the IRS § 1.701-2 adjustments to their respective returns are as follows.  Nevada Partners Fund, LLC, as it existed prior to being purchased by James Kelley Williams, raises its challenge to the readjustment of its partnership income tax returns Forms 1065 for October 22 to November 21, 2001; for November 22 to December 4, 2001; and for

_purpose of which is to reduce substantially the present value of the partners' aggregate federal tax liability in a manner that is inconsistent with the intent of subchapter K_, the Commissioner can recast the transaction for federal tax purposes, as appropriate to achieve tax results that are consistent with the intent of subchapter K, in light of the applicable statutory and regulatory provisions and the pertinent facts and circumstances.

[5]Mr. Michael N. Wilcove, counsel for the Justice Department, Tax Division, has informed the court that James Kelley Williams, upon advice of his CPA and attorneys, availed himself of losses he did not actually incur and applied them against a recapture for tax year 2001, thereby attempting to avoid a 3.3 million dollar tax liability.

December 5 to December 31, 2001, for a total of three cases.  Carson Partners Fund, LLC, as it existed prior to its being purchased by James Kelley Williams, brings four cases challenging Internal Revenue Service adjustments to its returns of partnership income for tax periods October 22 to November 21, 2001; for November 22 to December 4, 2001; for December 5 to December 12, 2001; and for December 13 to December 31, 2001.  Finally, Reno Partners Fund, LLC, as it existed prior to its being purchased by James Kelley Williams, challenges the Internal Revenue Service's adjustments to its tax returns for October 22 to November 21, 2001; for November 22 to December 4, 2001; for December 5 to December 12, 2001; and for December 13 to December 19, 2001.

Several principals need to be identified at the beginning of this discussion.  First, there is James Kelley Williams and his family.  James Kelley Williams is the principal owner of the named plaintiff in the instant case Nevada Partners Fund, LLC.  On and just after December 4, 2001, James Kelley Williams purchased the Nevada Partners Fund, LLC, the Carson Partners Fund, LLC, and the Reno Partners Fund, LLC, from the principals of a company called Bricolage, LLC.   Bricolage, LLC, is a hedge fund located in New York City which is owned by one Andrew Beer, a former Harvard Business School classmate of James Kelley Williams, Jr., a son of James Kelley Williams.

Next is the trinity of Nevada/Carson/Reno, LLCs.  Nevada may be viewed under the circumstances of this case as the holding company for Carson and Reno.  James Kelley Williams purchased the  Nevada/Carson/ Reno, LLCs, from the principals of Bricolage, LLC, pursuant to an investment strategy called the "Family Office

Customized" or "FOCus" Program,[6] the brainchild of Andrew Beer (and perhaps others in that firm).

Then, there is the IRS, the defendant in this action, which claims that it readjusted the LLCs' tax returns for the taxable year ending December 31, 2001, in a lawful and proper manner pursuant to Treas. Reg. 1.701-2.

Next, James Kelley Williams' Certified Public Accounting firm is KPMG. KPMG is the current name of Klynveld Main Goerdeler, a Swiss/European accounting firm which merged with Peat Marwick (US) and Peat Marwick McKlintock (GB) in 1990 to form KPMG Peat Marwick. The name of the merged entity was shortened to KPMG in 1995. The agent playing the major role for KPMG in this case was one Donna Bruce.

Finally, there are the attorneys for James Kelley Williams who were involved in this matter. They are from the law firm of Baker Donaldson, namely John Beard and William Painter.

When James Kelley Williams purchased Nevada, Carson and Reno from the principals of Bricolage, the names of the LLC's did not change, a matter which might cause confusion. Another matter which could be confusing is that Williams soon sold the Reno Partners Fund in order to take advantage of what had been represented to him by KPMG as a major tax advantage. This alleged tax advantage is at the very core of the dispute in this case. After the sale of Reno, only the Nevada and Carson entities remained in James Kelley Williams' possession. Through these LLC's, James Kelley Williams has enjoyed great investment success which the IRS does not challenge.

---

[6]This acronym stands for "Family Office Customized" or "FOCus" Program. (Stip. ¶ 35; Exhibits 206-J – 208-J).

Only the sale of the Reno Partners Fund and the manner in which it was accomplished has raised the IRS scrutiny which is the subject of this lawsuit. In order to avoid the points of possible confusion mentioned above, this court shall denominate the LLC's in a manner which will distinguish between the Nevada/Carson/Reno trinity before and after the purchase of these entities by Williams.

The purchase of Nevada, Carson and Reno by James Kelley Williams was concluded on or just after December 4, 2001. Consequently, the 2001 tax periods in question are divided between James Kelley Williams and the previous owners of the LLCs. The eleven aforementioned cases have been presented to the court by the parties in two categories, those pertaining to tax periods ending on or before the Williams purchase on December 4, 2001, and those pertaining to tax periods ending after December 4, 2001. The first category of interests are denominated as the "non-Williams" cases, while the second category of interests is referred to as the "Williams cases" or the "Williams companies" cases. So that there will be no doubt as to which of these two categories are being referred to below, the first category shall be called the "Nevada/Carson/Reno-Bricolage" (or NCR-Bricolage) companies, while the second category shall be called the "Nevada/Carson/Reno-James Kelley Williams" (or "NCR-JKW") companies.

This case, as has been presented to the court after several weeks of witnesses and hundreds of documents, concentrates on the challenge to these same Internal Revenue Service adjustments raised by James Kelley Williams, the purchaser of the Nevada, Carson and Reno LLCs and their assets in transactions occurring between December 4 and December 21 of 2001. The purchase of Nevada and Carson, and of

7

Reno with imbedded losses not actually incurred by Williams, is the matter contested by the IRS as an abusive tax shelter.

This case is focused on what happened after the December 4, 2001, purchase of the Nevada, as well as the subsequent 2001 purchases of Carson and Reno partnerships by James Kelley Williams;  how the losses embedded in Reno were treated by Williams for 2001 tax purposes, and what connection, if any, the tax transaction had with the investment activity conducted by Williams after January of 2002.  Central to the dispute between the parties is the ultimate purpose for which the James Kelley Williams companies decided to purchase the LLCs in question, and whether these purchases were simply part of an overall long term investment strategy, as asserted by the plaintiffs, or whether the purchase of the LLCs in 2001 was entered into solely for the purpose of tax avoidance, without true economic purpose, intent and substance, and without any nexus to the overall investment success the Williams later enjoyed.  As for the Nevada/Carson/Reno-Bricolage (or NCR-Bricolage) companies, the fate of their claims rises or falls on this court's determination of the claims of the Nevada/ Carson/Reno-James Kelley Williams" (or "NCR-JKW") companies in Nevada Partners Fund, LLC v. United States of America, Civil Action No. 3:06-cv-379 HTW/MTP.

## PERTINENT FACTS

In 2001, James Kelley Williams and his companies stood to realize a significant gain on a business arrangement involving the B.C. Rogers Company, a Mississippi poultry producer.  Pursuant to this arrangement, James Kelley Williams was instrumental in obtaining operating capital for B.C. Rogers poultry production interests

by arranging a loan secured by his own wealth and reputation for the use and benefit of B.C. Rogers in the amount of twenty five million ($25,000,000.00) dollars. Williams was the party named on the promissory note who was obligated to make payments of principal and interest on this loan. According to the IRS, Williams had benefit of the Subchapter S corporation tax deductions associated with this loan [see Exhibit 277D].[7]

Ultimately, due to business developments with B.C. Rogers which are not pertinent to the facts of this case, a note exchange took place which transferred the loan to B.C. Rogers as the responsible party. This resulted in cancellation of the liability James Kelley Williams had undertaken and, consequently, a taxable gain in the form of a recapture. This recapture was the consequence of prior tax treatment of the B.C. Rogers loan payments, and amounted to $18.3 million dollars for the 2001 tax year.[8]

Another large gain, which is not an issue in the present case, loomed for Williams in the 2002 tax year. In 2001, Williams anticipated selling his interest in ChemFirst, Inc., the company to which he had contributed a substantial portion of his

---

[7]A typical strategy for an S shareholder is to arrange for a personal loan from a bank and then re-loan the funds to the S corporation. However, consequences arise when the shareholder is repaid or his obligation is cancelled since recapture will occur in the form of either capital gain or ordinary gain. See IRS Rev. Rul. 64-162 (repayment of a loan evidenced by an instrument is considered capital gain); and Rev. Rul. 68-537 (repayment of a shareholder loan not evidenced by an instrument (known as an "open account" loan) results in ordinary income treatment). *See The Free Library On Line > S shareholder loans: potential tax trap.*

[8]The cancellation, discharge or assumption of a debt has long been considered a taxable gain to the debtor. "While economic gain is not always taxable as income, realization of gain need not be in cash derived from sale of asset, and 'gain' may occur as the result of exchange of property, payment of a taxpayer's indebtedness, *relief from a liability*, or other profit realized from completion of a transaction." *Helvering v. Bruun*, 309 U.S. 461, 469, 60 S.Ct. 631, 84 L.Ed. 864 (1940). Additionally, one may recapture the tax benefits taken in prior years when they reduced the tax basis in an item. The taxpayer is required to report the recapture as current income. *See Charbonnet v. U.S.*, 455 F.2d 1195, 1198 (5th Cir. 1972).

time and talent.  The buyer was the giant in the field of chemicals production and their applications, DuPont.  Williams had been the Chief Executive Officer of Mississippi Chemical, First Mississippi Corporation and, ultimately, ChemFirst for thirty-one years at the time this purchase first was contemplated.  Under Williams' leadership, First Mississippi had become the first Mississippi corporation to be listed on the New York Stock Exchange.  The company began its successful run as a fertilizer manufacturer, then expanded its operations over the years into other areas requiring specialty chemicals such as pharmaceuticals, electronics and industrial coatings.  When Williams sold his interest in ChemFirst in 2002, the gain exceeded $15 million dollars.

Thus, in 2001, Williams was faced with two large capital gains in the current year and the year following.  He took the action that one with his extensive business acumen[9] might be expected to take, contacting his accountant and tax advisor KPMG, and his attorneys at the Baker Donaldson law firm.  A meeting on this matter was scheduled on October 2, 2001, to discuss a strategy by which at least part of these large gains could be ameliorated.

### The Bricolage FOCus Approach Recommended by KPMG

At the October 2, 2001, meeting, Williams and his attorneys met with KPMG agent Donna Bruce, who understood that the purpose of the meeting was to alleviate large gains arising from the B.C. Rogers note exchange, having been informed that the

---

[9]James Kelley Williams obtained a chemical engineering degree from Georgia Tech and an MBA  from the Harvard Business School.  He became the CEO of First Mississippi Corp. in 1970 and continued in that capacity until the 2002 sale of the company to Dupont.  According to the testimony, he is a person well versed in matters of investment and the stewardship of his family assets.

gain would amount to nearly $20,000,000.00. She told Williams that KPMG had been recommending to its clients facing the imminent prospect of large ordinary and capital gains a new strategy to be pursued through an investment advisor experienced in financial structure, hedge funds and more exotic forms of investment designed to provide tax benefits. Bruce named several investment advisors to be considered by Williams, including a hedge fund called Bricolage, LLC, in New York City, an entity owned and managed by one Andrew Beer. As noted above, Andrew Beer had attended the Harvard Business School and was a student there at the same time as Williams' oldest son, James Kelley Williams, Jr. Because of this connection with Andrew Beer, James Kelley Williams and his son were encouraged to seek more information about what Bricolage offered.

The instrumental person at the October 2, 2001, meeting on the development of a strategy was Donna Bruce. She explained in some detail the FOCus structure offered by Bricolage, using materials furnished by Bricolage, including a power point presentation [Exhibit 285D]. Bruce showed how Bricolage had tailored a multi-step process through a three-tiered structure of LLCs which would produce both gains and losses. Her presentation is outlined in detail by the notes of Williams' attorneys. *See* Exhibit 411D (the notes of William Painter), and Exhibit 412D (notes taken by John Beard).

The first step of this strategy, as outlined by Donna Bruce, was establishment of a fund of funds[10] (FOF LLC), which would be formed by the investment manager and a

---

[10]A fund of funds is a managed fund that invests in other managed funds.

third party, and used as a holding company for a portfolio of other investments, funds and cash.  *See* Exhibit 285D (p.5).

The second step called for formation of an alternative investment fund (ALT LLC) composed of fund of funds investments entered into with the fund manager. [Exhibit 285D (p.5)].  The ALT LLC would pursue option-style foreign exchange investment where the investor would have the right, but not the obligation, to exchange money denominated in one currency into another currency at a pre-agreed exchange rate on a specified date.

The third step of this approach involved formation of the third tier of the LLC structure called the FC LLC, 99% owned by the ALT LLC, which would invest in forward contracts, the type of investments where no money actually changes hands until some agreed upon future date.  In the instant case, the FC LLC engaged in a foreign exchange "straddle" trade.[11]  Usually, a straddle involves buying a call[12] (or long) option and a put[13] (or short) option in the same commodity, security or other investment.  Each of these options is sometimes referred to as a "leg" of the straddle.  A gain in one option usually means a loss in the other, although the outside chance of gains in both legs does exist.  In foreign exchange trading, the success of either leg of the straddle

---

[11]The term "straddle" refers to "offsetting positions" with respect to personal property. Title 26 U.S.C. § 1092(c)(1).  Federal tax law presumes that positions are offsetting if, "the positions are sold or marketed as offsetting positions (whether or not such positions are called a straddle, spread, butterfly, or any similar name), ... ."  Title 26 U.S.C. § 1092(c)(3)(iv).

[12]A Call Option allows one to exercise a previously agreed upon right to purchase commodities or financial paper.

[13]A Put Option permits one to sell an option listed on a security at a higher price than its value on a record date as a way to protect against a future decline in value.

depends on the exchange rate differential between two currencies such as the Dollar against the Euro or, as in the instant case, the Dollar against the Japanese Yen. Occasionally, this type trade will be affected by changes in interest rates set by a nation's banks and monetary policy makers, as well as the existing exchange rates between currencies. Once gains and losses were established in the straddle trade, the gains would be taken and placed in certificates of deposit with the global bank selected to carry on the trade. The losses would be suspended on the books of the FC LLC. Once this was done, Bricolage then would seek a buyer for the three-tier LLC, usually a wealthy investor (such as Williams) who was seeking to offset large taxable gains. The investor was told that he could utilize the losses contained in the FC LLC to the extent of his investment basis. A legal opinion approving of this strategy would be provided to the investor to protect the investor in the event of an IRS audit.[14]

The third-tier LLC of the partnership, or FC LLC, was critical in the overall strategy offered by Bricolage since the straddle approach would generate suspended losses. The taxpayer/investor's ability to take advantage of these losses against large capital and ordinary gains was the attractive feature and selling point of this type strategy. Using this approach, Williams could offset the recapture gain from the B.C.

---

[14]In the case of *Chew v. KPMG, LLP*, 407 F.Supp.2d 790 (S.D. Miss. 2006), the Honorable District Judge William H. Barbour, reading from the complaint in that case, noted that KPMG marketed these forms of tax strategies to its long-term wealthy clients. The strategy involved using the services of an investment advisor [who] provided the design and rhetoric to recast the tax strategies as investment strategies. A global bank then would provide financing and nominal investment transactions that provided the investment "cover" to disguise the tax driven motives. A law firm would provide the purportedly "independent" opinion letters blessing the proposed strategy and supposedly insulating the clients from IRS penalties in the event of an audit.

Rogers loan.  This  would require Williams to purchase the three LLCs and then to contribute enough capital to establish a sufficient basis in the three-tier LLC structure.[15] Otherwise, without a sufficient basis in the LLCs, the investor would not be able to take full advantage of all the losses generated by the FC LLC.

The fourth step was for the investor to purchase the fund of funds LLC from the third party usually associated with Bricolage.  This step was accomplished by Williams on December 4, 2001, when he purchased a 99% interest in the FOF LLC (Nevada Partners Fund), with Bricolage owning the remaining 1% interest.

The rest of the steps presented by Donna Bruce at the October 2, 2001, meeting proposed the contribution of capital to purchase the FOF LLC's (Nevada's) assets (step 5); acquire a 99% interest in the ALT LLC (Carson) one month later (step 6); the Alt LLC (Carson) then would borrow foreign currency and invest in foreign exchange options (step 7); the investor then would meet his capital contribution obligation (step 8); the FC LLC (Reno) then would recognize the losses incurred in step 3 so the investor could receive benefit of the losses from ownership of the Alt LLC (Carson) (step 9); 90 days later the ALT LLC would liquidate its currency options and retire its loan, with any gain offset by suspended loss (step 10).  After all of these steps assuring the creation of a loss to be used against gains from another transaction were accomplished, the investor could engage with Bricolage in an investment program continuing for at least three years through the investor's ownership of the FOF LLC and

---

[15]Tax payers who choose partnership tax treatment can only deduct losses from their taxable income to the extent of their basis in the partnership.  *Klamath Strategic Investment Fund ex rel. St. Croix Ventures v. U.S.*, 568 F.3d 537, 542 (5th Cir. 2009), referring to Title 26 U.S.C. § 752 *et seq.* of the Internal Revenue Code.

the Alt LLC (step 11). This was the only reference to investment made in KPMG's power point presentation. KPMG's instruction regarding the three-tiered FOCus structure dealt with its affect on Williams' 2001 tax circumstances.

The KPMG presentation of the FOCus approach to Williams also included a Summary of Tax Consequences [Exhibit 285D (p.14)]. The very first item noted is that the "loss resulting from the investor's purchase of the ALT LLC interest from FOF LLC is *suspended until its subsequent disposition by investor*."

The second item notes that the investor *will increase its basis in* the ALT LLC by providing a loan guarantee on the loan of foreign currency to conduct the option trades and the straddle trades. Presumably, the purpose of this guarantee was to collateralize the foreign currency loan from the global bank selected to facilitate the foreign currency trades. However, the guarantee also served the purpose of increasing the investor's basis in the ALT LLC, thereby enabling any losses generated by the FC LLC to enure to the investor's benefit to the extent of his basis.

Next, KPMG noted that an investor would recognize a pro-rata share of the FC LLC's (Reno's) option/forward contract losses via the investor's percentage ownership of the ALT LLC (Carson). This court notes that an investor who purchased virtually all of the ALT LLC interest would be able to recognize virtually all the losses embedded in the FC LLC. These were not losses actually incurred by the investor through any economic participation in the Reno straddle trade. Indeed, the Reno straddle trade was conducted by the NCR-Bricolage companies, not Williams. So, the losses left embedded in Reno were losses purchased by the investor, Williams.

The last tax consequence noted by KPMG was that the suspended losses in

15

Reno would offset any gain resulting from the FC LLC's (Reno's) repayment of the foreign currency loan. However, this is not exactly what happened in the instant case. Instead, Reno's forward foreign currency straddle resulted in about $18,000,000 in gains and, ultimately, just over $17,000,000 in losses.[16] The gains were realized and placed into certificates of deposit with Credit Suisse First Boston, the global bank selected for this purpose by the NCR-Bricolage companies prior to Williams' involvement with the FOCus program. The losses remained suspended on the books of Reno for a future investor, in this case Williams, to dispose of any manner desired, including the offset of the expected recapture gain from the B.C. Rogers loan.

Next, KPMG set out the Implementation Considerations for FOCus [Exhibit 285D (p.15)]. These included the promise of an individually tailored long-term investment program with Bricolage; the purported need for a guarantee of the foreign exchange loan made by Credit Suisse; a representation letter and a tax opinion letter from the Arnold & Porter law firm stating that the three-tiered partnership approach would survive IRS scrutiny; and sufficient "liquidity" or cash in order to carry out the plan. Additionally, and notably for the purposes here, the Implementation Considerations included the proviso that IRS tax shelter registration and listing requirements should be followed. In the instant case, however, the strategy followed by the plaintiffs was not registered as a tax shelter.[17]

---

[16]See the testimony of Dr. Timothy Weithers, explaining the forward currency trades conducted by Reno, at pages 1870 through 1890 of the trial transcript.

[17]Title 26 U.S.C. § 6111(a) requires organizers to register certain tax shelters, and 26 U.S.C. § 6112 requires those who organize or sell a potentially abusive tax shelter, as defined therein, to maintain a list of investors to be made available at the request of the Internal

Finally, the FOCus approach presented by KPMG set forth a listing of certain economic risks and tax risks, including the possibility of IRS controversy, underpayment penalty, attorney fees which might be incurred defending the FOCus approach if challenged by the IRS, and noting that the IRS recently had focused its attention on the propriety of certain tax shelters.  All of this was presented to the participants in the October 2, 2001, meeting as is set forth in the notes of Williams' attorneys, William Painter and John Beard.  Once KPMG understood that Williams would be interested in the FOCus strategy and Bricolage was so informed, the NCR-Bricolage companies, as the transitory partners preceding Kelley Williams in Nevada, Carson and Reno, set matters into motion.

### Activity of the NCR-Bricolage Companies Before December 4, 2001

Once KPMG recommended the FOCus plan to Williams, the NCR-Bricolage companies Nevada Carson and Reno, then owned by Bricolage associates, began the process of generating the three-tiered partnership tax losses that would be embedded in the FC LLC prior to the structure being offered to an investor.  Between October and December of 2001, Reno (the FC LLC) engaged in a foreign exchange straddle trade which included a "collar" designed to confine gains and/or losses on the trade to a specific range.  Generally, in a collar transaction, a put option is purchased, and a call option sold, by the investor to a bank.  Sometimes called a "costless collar," the amount received on the sold option is equal to the amount due on the purchased option, and

Revenue Service.  Title 26 U.S.C. §§ 6707 and 6708 impose penalties for violations of, respectively, §§ 6111 and 6112.

the proceeds from selling the call option are used to purchase the put option. *See Jade Trading, LLC v. U.S.*, 80 Fed.Cl. 11 (Fed. Cl. 2007).

In the instant case, this trading activity was conducted through Credit Suisse First Boston. Credit Suisse took multi-million dollar long and short positions on a foreign currency, closed $18,000,000.00 of gains and locked in just over $17,000,000.00 in losses. Thus, the gains and losses were established early in the straddle trade process. The gains were placed in certificates of deposit with Credit Suisse, while the losses were suspended on the books of Reno. Once this was done, Bricolage was prepared to approach Williams as a potential buyer for the three-tiered LLCs with the losses embedded in Reno. This activity, carried out by the transitory partners who were Bricolage employees, took place without any participation by Williams.

### *Contemporaneous Internal Revenue Service Notices*

Several regulations legal opinions and IRS notices were published and available to tax accountants and taxpayers at the time James Kelley Williams was considering pursuit of the FOCus strategy touted by KPMG in late 2001. In his pre-trial memorandum, counsel for Williams asserts that no notices had been issued by IRS which would have served as a warning against proceeding with the FOCus plan on December 4, 2001. Notwithstanding this assertion, this court finds that certain IRS Notices, as well as court opinions, and a specific notice given to KPMG by IRS on October 17, 2001, were available to give one pause when considering a plan such as FOCus.

In 1999, the IRS observed that very large amounts of capital gains seemed to be disappearing from the nation's tax base via strategies like the one in this case where large "not-out-of-pocket" losses were created in order to offset large gains. *See Kligfeld Holdings v. C.I.R.*, 128 T.C. No. 16, 128 T.C. 192 (U.S. Tax Ct. 2007). So, on December 10, 1999, the IRS issued Notice 99-59, 1999-52 I.R.B. 761, entitled TAX AVOIDANCE USING DISTRIBUTIONS OF ENCUMBERED PROPERTY. This notice alerted taxpayers that *purported losses*[18] arising on particular types of transactions would not be permitted and that penalties could be imposed both on the taxpayers and on the persons who promoted these types of transactions. Additionally, the IRS issued Sec. 301.6111-2T, Temporary Income Tax Regs., 65 Fed.Reg. 11218 (Mar. 2, 2000), which provided the same advisory.

Then, on August 13, 2000, the IRS issued Notice 2000-44 2000-36 I.R.B. 255, entitled TAX AVOIDANCE USING ARTIFICIALLY HIGH BASIS. The notice warned taxpayers of transactions calling for the simultaneous purchase and sale of offsetting options transferred through a partnership to generate a loss. The notice determined that the purported losses from such offsetting option transactions *did not represent bona fide losses* reflecting actual economic consequences and that the purported losses were not allowable for federal tax purposes. *See Jade Trading, LLC v. United States*, 80 Fed. Cl. 11 (2007).

Both of the above Notices, addressing the matter of losses not actually sustained, but obtained for use against gains in unrelated transactions, cited the

_____

[18]The reference to purported losses meant losses what were not real, not incurred by the taxpayer.

contemporaneous case law which instructed as follows:

> ... a loss is allowable as a deduction for federal income tax purposes only if it is bona fide and reflects actual economic consequences. An artificial loss lacking economic substance is not allowable. *See ACM Partnership v. Commissioner*, 157 F.3d 231, 252 (3d Cir. 1998), *cert. denied*, 526 U.S. 1017, 119 S.Ct. 1251, 143 L.Ed.2d 348 (1999) ("Tax losses such as these … which do not correspond to any actual economic losses, do not constitute the type of 'bona fide' losses that are deductible under the Internal Revenue Code and regulations."); *Scully v. United States*, 840 F.2d 478, 486 (7th Cir. 1988) (to be deductible, a loss must be a "genuine economic loss"); *Shoenberg v. Commissioner*, 77 F.2d 446, 448 (8th Cir. 1935) (to be deductible, a loss must be "actual and real"); ... "

The *Schoenberg* case cited in these Notices, a 1935 decision, refers to § 1.165 of the Income Tax Regulations, the section addressing losses which are allowed as a deduction for tax purposes.  This Regulation still provides in relevant part today that, "[t]o be allowable as a deduction under section 165(a), a loss must be evidenced by closed and completed transactions, fixed by identifiable events, and, except as otherwise provided in section 165(h) and § 1.165-11, relating to disaster losses, *actually sustained* (meaning sustained by the taxpayer) during the taxable year. Only a bona fide loss is allowable.  Substance and not mere form shall govern in determining a deductible loss."  *See* 26 C.F.R. § 1.165-1 (emphasis added).

The *ACM Partnership* decision cited in the two Notices observed that, "[i]n assessing the economic substance of a taxpayer's transactions, the courts have examined 'whether the transaction has any practical economic effects other than the

creation of income tax losses,' *Jacobson v. Commissioner*, 915 F.2d 832, 837 (2d Cir. 1990) (citations and internal quotations omitted), and have refused to recognize the tax consequences of transactions that were devoid of 'nontax substance' because they 'did not appreciably affect [the taxpayer's] beneficial interest except to reduce his tax.'" *See Knetsch v. United States*, 364 U.S. 361, 366, 81 S.Ct. 132, 135, 5 L.Ed.2d 128 (1960).

Recently, the United States Court of Appeals for the Fifth Circuit cited IRS Notice 2000-44, stating that this notice warned taxpayers *as early as the year 2000* that a particular scheme called the "Son of BOSS" tax shelter was abusive (emphasis added). *Kornman & Associates, Inc. v. U.S.,* 527 F.3d 443, 446 (5th Cir. 2008). The Fifth Circuit explained that the "BOSS" strategy, an acronym for "Bond and Option Sales Strategy," was already a scheme denominated an abusive tax shelter by the IRS. The Son of BOSS strategy, said the Fifth Circuit, was a variant of BOSS which, "uses a series of contrived steps in a partnership interest *to generate artificial tax losses designed to offset income from other transactions* (emphasis added)." *Id.*

**Concerns About the FOCus Strategy, the IRS Notices, and the Recent Rulings**

In the instant case, KPMG's goal for the 2001 tax year was to assist Williams with a strategy which would generate tax losses and which, in turn, would be available to offset gains from a different transaction (losses from the FC LLC to be created in the FOCus steps would be available to offset the recapture from the B.C. Rogers loan).

Both KPMG and Williams' attorneys knew about IRS Notice 2000-44 and the IRS treatment of the "Son of BOSS" strategy when the FOCus strategy was presented to Williams on October 2, 2001. In paragraph 1 of Exhibit 422D, an e-mail from John

Beard to William Painter, Williams' attorneys, dated October 12, 2001, Beard states that, "[t]here was an IRS notice on it." In paragraph 2 Beard refers to 2000-44 specifically and notes that KPMG believed that the strategies it was marketing could avoid the treatment given to the BOSS and the Son of BOSS strategies. However, Beard referred to this assumption as the "KPMG risk", meaning that KMPG hoped the FOCus strategy was structured in a way that would avoid IRS scrutiny. This was not a certainty on KPMG's part as shall be shown.

John Beard also referred to the *ACM Partnership* decision in the October 12, 2001, e-mail, a case cited in IRS Notice 2000-44, saying to his law partner that, notwithstanding its holding against the taxpayer, Tracy Smith of KPMG had informed him of a "district court" decision which had ruled in favor of the taxpayer.[19] Beard at that point hoped for at least some inconsistency in the law. However, on October 17, 2001, just two weeks after the KPMG meeting with Williams, KPMG was notified by IRS that it was being investigated regarding the role it may have played in the developing and promoting of fraudulent tax shelters. *See Sala v. U.S.*, Not Reported in F.Supp.2d, 2007 WL 1970317 (D. Colo. 2007), referring to this particular notification of KPMG by IRS on October 12, 2001, as well as to a February, 2002 notification that the investigation would be expanded. *See also Sala v. U.S.,* 552 F.Supp.2d 1167, 1204

_____

[19]The case referred to by Tracy Smith may have been *Salina Partnership LP v. C.I.R.*, T.C. Memo. 2000-352, 2000 WL 1700928 U.S.Tax Ct., 2000, a ruling in part for the IRS by finding that failure to close a short sale of Treasury Bonds was a liability of the partnership and could not be used as a loss, thereby eliminating the loss relied on by the taxpayer altogether; and in part for the taxpayer, finding, under the facts, that an investment scheme was all one strategy, not one for investment and one for tax purposes. The plaintiffs tout *Salina*'s "one strategy" finding for the purposes of the instant case, but other holdings in *Salina* also must be considered.

(D. Colo. 2008), reconfirming the October and February dates KPMG was given notice of the IRS investigation of its role regarding the recommendation of tax shelters. In passing, this court notes that these investigations resulted in criminal indictments of several accountants and attorneys of KPMG in 2005.[20] There is nothing presented to this court to show that Williams was informed of the October 17, 2001, IRS notice to KPMG, or the February 2002 IRS notice, or that anyone at KPMG informed John Beard of these particular notices.

On October 12, 2001, John Beard, apparently concerned that FOCus might be called into question by the IRS, sent an e-mail to Donna Bruce of KPMG asking why the FOCus strategy through Bricolage was not subject to IRS Notice 2000-44 and why FOCus was not subject to being reported to IRS as a tax shelter under Title 26 U.S.C. § 6111(a). On November 1, 2001, Tracie Henderson with KPMG responded to John Beard, stating that registering the FOCus program as a tax shelter would not be necessary because it would meet "the two to one test," meaning the basis to loss ratio would be 2:1 [Exhibit 1327D]. How Tracie Henderson knew at that time what the basis ratio in the three-tiered partnership would be, when Williams did not decide to participate in FOCus until December 4, 2001, is not clear.

Beard also asked why KPMG would not be required to maintain and report a list of investors in FOCus pursuant to Title 26 U.S.C. § 6112. [Exhibit 249D]. Beard made this inquiry ostensibly because he was concerned about the fate of other similar tax

---

[20]In 2006 the charges against these employees and attorneys were dismissed by the district judge who concluded that the government deprived the defendants of their right to counsel under the Sixth Amendment by pressuring KPMG to impose conditions on the advancement of legal fees to defendants, then to cap the fees, and ultimately to end payment of legal fees. This ruling was affirmed in *U.S. v. Stein*, 541 F.3d 130 (2nd Cir. 2008).

strategies such as the "Currency Options Bring Reward Alternatives" (COBRA) strategy which was marketed by agents of BDO Seidman[21] and was rejected as abusive by IRS; and about BOSS, which the IRS specifically regarded as an abusive tax shelter in Notice 2000-44. Clearly, Beard recognized the similarity between these programs and the FOCus strategy.

Beard asked Bruce to contrast existing case law, particularly the *ACM Partnership* decision cited in the IRS Notices, and the *Salina* Tax Court Memorandum.[22] This was a decision for the IRS in part and for the taxpayer in part which refused to analyze the economic substance of the disputed transaction by focusing solely on events occurring during the three day period from December 28 through 31, 1992. The court concluded that the facts of the case supported the conclusion that the taxpayer began the transaction to accomplish a valid business purpose.

On November 6, 2001, John Beard sent an e-mail to Kelley Williams, Jr., noting that the nearly $600,000.00 dollars for the purchase of Carson was essentially a payment to Nevada since Nevada was a 99% owner of Carson (which was, in turn, a 99% owner of Reno). Beard informed Williams, Jr., that, "it is preferable that the first tier LLC be utilized for some form of conventional investments in the next year or two,

---

[21]Like KPMG, BDO Seidman, headquartered in Chicago, provides tax, financial advisory and consulting services, and was investigated for tax shelter marketing of strategies like COBRA, SOS, HOMER and others, which were executed simply to generate large tax losses for use by wealthy clients to offset other gains, and ultimately were found to be abusive by IRS in June of 2003, retroactively to October 18, 2001, based on the 1999 and 2000 IRS Notices.

[22]*See Salina Partnership LP v. C.I.R.*, T.C. Memo. 2000-352, 2000 WL 1700928 U.S.Tax Ct.,2000, holding that modest profits relative to substantial tax benefits are insufficient to imbue an otherwise dubious transaction with economic substance.

otherwise it appears to have no purpose other than to allow the creation of the suspended loss. ... This would be in addition to the approx. $10 M required to avoid tax shelter registration, but it goes to the business purpose and sham transaction defense." Apparently, Beard was attempting to prepare for any IRS challenge that was likely to come [Exhibit 250D].

Finally, Beard specifically asked what potential tax penalties could apply; whether one might expect to settle any tax deficiency on appeal, if there was an IRS examination; what the amount of tax savings would be in light of the transaction fees; and what amount of return would have to be realized in order to break even if Williams ultimately had to pay tax on the transaction, plus interest and penalties [Exhibit 249D]. Beard's questions and comments denote his awareness of possible IRS storm clouds on the horizon.

### KPMG Adheres to its Recommendation of the FOCus Strategy

Notwithstanding the existing IRS notices and the *AMC* decision, as well as the IRS notice issued specifically to KPMG on October 17, 2001, KPMG still recommended the FOCus strategy to Williams, primarily touting the three-tiered LLC structure as a way to neutralize the tax effect of the B.C. Rogers loan recapture before the end of 2001. Meanwhile, the multi-tiered partnership, straddle investment and transitory partner approach to creating embedded losses for tax reduction or tax elimination purposes was about to be the subject of another IRS notice in June of 2002.

KPMG's recommendation was not without caveat. Once Williams decided to participate in the Bricolage program being promoted through KPMG, KPMG submitted to Williams an engagement letter for its tax consulting services, recommending that

Williams seek independent advice with regard to the investment aspects of the Bricolage program before agreeing to participate. Exhibit 1265D. Whether such advice was sought by Williams from any independent source is not relevant here. Instead, the central point in 2001 of following the strategy being promoted by KPMG was to ameliorate Williams' tax situation, regardless of Williams' investment activity.

KPMG also noted several understandings which were inherent in Williams' decision to participate in the recommended steps. One such understanding set forth at page 3, second full paragraph of Exhibit 1265D, was Williams' recognition that, "the Internal Revenue Service may challenge the intended results of the Investment Program and could prevail under various tax authorities. You also acknowledge receipt of a memorandum that discusses certain penalties that might be assessed by the Internal Revenue Service should it challenge any tax deductions or tax losses that you may claim with respect to participation in the Investment Program." KPMG could not state with certainty that the generated tax losses inherent in the FOCus three-tiered partnership structure would pass IRS scrutiny. Ultimately, it did not.

A draft of KPMG's engagement letter, Exhibit 1465D, worded the above recited recognition more strongly, stating that, "[y]ou recognize that the Investment Program *is aggressive in nature* and that the Internal Revenue Service may challenge the intended results ... ." However, the phrase "aggressive in nature" is omitted from the final draft of the engagement letter. In Exhibit 419D, more of John Beard's notes taken at the October 2, 2001, meeting with Williams and KPMG, Beard circled the words "recognize aggressive in nature" and wrote above the circle "ok to strike," meaning that this language should be omitted from the engagement letter to Williams.

KPMG's caveat about IRS scrutiny concerning the FOCus program soon was borne out when the IRS notified KPMG in April of 2002[23] that KPMG was being compelled to produce names, opinions and documents pertaining to all participants in the FOCus program through Bricolage. KPMG notified Williams that the likely upshot of this notification was that Williams' tax return for 2001 would be audited and that Williams' particular FOCus strategy would be questioned [Exhibit 1270D]. However, there was more to come.

On June 27, 2002, two months after KPMG received notice from the IRS that its tax shelter activity was being investigated, the IRS released the PARTNERSHIP STRADDLE TAX SHELTER Notice 2002-50 stating as follows:

> **Partnership straddle tax shelter**. This notice advises taxpayers and their representatives that the described transaction, which uses a straddle, a tiered partnership, a transitory partner and the absence of a section 754 election to obtain a permanent non-economic loss, is subject to challenge by the Service on several grounds. The notice holds that the described transaction is now a "listed transaction" and warns of the potential penalties that may be imposed if taxpayers claim losses from such a transaction.
>
> The Internal Revenue Service and the Treasury Department have become aware of a type of transaction, described below, that is being used by taxpayers for the purpose of generating deductions. This notice alerts taxpayers and their representatives that the tax benefits purportedly

_____

[23]In *Epsolon Ltd. ex rel. Sligo (2000) Co., Inc. v. U.S.*, 78 Fed.Cl. 738 (Fed.Cl. 2007), a case dealing with KPMG's failure to produce requested documents, the Claims Court noted that in 2002 the IRS began an investigation and enforcement proceeding in the United States District Court for the District of Columbia against KPMG, looking into KPMG's role in the promotion and participation in abusive tax shelters.

generated by these transactions are not allowable for federal income tax
purposes. This notice also alerts taxpayers, their representatives, and
promoters of these transactions of certain responsibilities that may arise
from participating in these transactions.

Notice 2002-50 describes a transaction involving partnerships manipulated
through a series of steps with no Title 26 U.S.C. § 754[24] election in effect at any
relevant time.  The transaction described in this Notice, like the FOCus steps in the
instant case, was a straddle, a tiered partnership structure, with a transitory partner, all
designed to allow an interested taxpayer at some point to follow the prearranged steps
and claim a permanent non-economic loss.  The IRS gave notice of its intent to
challenge the purported tax benefits from this type transaction on a number of grounds.
In relevant part, these grounds included (1), the partnership anti-abuse rule contained
in § 1.701-2(b) of the Income Tax Regulations which usually disallows any deduction
claimed by the taxpayer upon the termination of the loss leg of the straddle.  *See*
§ 1.701-2(d); (2), Title 26 U.S.C. § 988 (governing treatment of foreign currency gains
or losses attributable to a forward contract, futures contract or option;  and (3), the
judicial doctrines applicable to this dispute, including the step transaction doctrine and
the doctrines of economic substance, business purpose, and substance over form.  The
Notice also stated that transactions, "that are the same as, or substantially similar to,

---

[24]When a new partner acquires a partnership interest, he typically pays fair market value
for that interest, which can result in discrepancies between his outside basis and his share of
the partnership's inside basis. To help balance out those discrepancies, section 754 allows a
partnership to elect to adjust the inside basis of partnership assets to reflect the new partner's
different outside basis. *See Kligfeld Holdings v. C.I.R.* 128 T.C. No. 16, 128 T.C. 192
U.S. Tax Ct.,2007.  Election issues do not appear to be disputed in the instant case.

the transaction described in this notice are identified as "listed transactions" for purposes of § 1.6011-4T(b)(2) of the temporary Income Tax Regulations and § 301.6111-2T(b)(2) of the temporary Procedure and Administration Regulations." ... Persons who are required to satisfy the registration requirement of § 6111 with respect to the transaction described in this notice and who fail to do so may be subject to the penalty under § 6707(a). Persons who are required to satisfy the list-keeping requirement of § 6112 with respect to the transaction and who fail to do so may be subject to the penalty under § 6708(a).

Finally, the Notice says that the IRS may impose penalties on participants in this type transaction or substantially similar transactions or, as applicable, on persons who participate in the promotion or reporting of this transaction or substantially similar transactions, including the accuracy-related penalty under § 6662, the return preparer penalty under § 6694, the promoter penalty under § 6700, and the aiding and abetting penalty under § 6701.

The parties have disputed the applicability of this IRS Notice because it was released only after Williams decided to pursue FOCus on December 4, 2001. However, in April of 2002, Williams was informed by KPMG that he might be audited. Williams acknowledges that he consulted with counsel at this point. Williams also acknowledges that he waited for an opinion letter from Arnold & Porter before reconsidering the proper tax treatment of Reno's embedded losses. The Arnold & Porter opinion letter was not finalized and available for consideration until October 11, 2002. Meanwhile, IRS Notice 2002-50 already was released and available for consideration in June of 2002, and was published in July. Williams' pre-trial

memorandum suggests that the Arnold & Porter opinion letter preceded IRS Notice 2002-50, but it did not. The Notice provided a warning specifically against the use of the tiered partnerships, straddle investing, and transitory partners, among other things, to generate deductions. This Notice also warned of the potential penalties that might be imposed. Nevertheless, Williams' advisors chose to rely on the Arnold & Porter legal opinion dated October 11, 2002. The Arnold & Porter endorsement of the FOCus strategy stated that the tax treatment in question was more likely than not the correct position, notwithstanding all the previously mentioned IRS Notices, particularly 2002-50 which was released four months prior the final opinion letter.

**The Decision by Williams to Pursue the FOCus Approach/December 4, 2001**

On December 4, 2001, James Kelley Williams, on behalf of the JKW 1991 Revocable Trust, entered into a Strategic Consulting Agreement (SCA) with Bricolage Capital, LLC [Exhibit 245J; or 51D]. *See also* Exhibit 232J at page 361, providing a schematic wire diagram of the structure resulting from the JKW Trust/Bricolage association through the SCA and the multi-step process. While the SCA offers Williams Bricolage's consulting services with regard to preparing one or more asset reallocation models, statistical analysis of long-term scenarios, and advice on structure for holding the client's investments, the SCA makes no specific reference to FOCus, nor does any language refer to any attractive tax advantage to be gained from Williams' association with Bricolage. The SCA further states that it does not include "on-going investment advisory services or advice, but Bricolage promises to devote "reasonable time and attention" to providing its consulting services. Moreover, the SCA provides that it may be terminated by either party upon written notice for any reason or no

reason, so long as the consulting fee has been earned. That fee, purportedly agreed to after negotiation, amounted to $845,000.00.

Additionally, on December 4, 2001, Williams entered into a Purchase Agreement with JJC Trading, LLC, ASA Trading, Inc., and Bricolage Capital Management Company (BCMC) as the Administrative Member[25] [Exhibit 43J], to purchase a 99% interest in the Nevada Partners Fund, LLC, for an aggregate price of $883,110.01. These parties also entered into an Assignment and Assumption Agreement [Exhibit 35J] which approved the transfer of the Nevada Fund to James Kelley Williams in exchange for capital contributions and payments provided for in a separate Operating Agreement, as well as the assumption of all obligations and liabilities of the assignors. BCMC retained a 1% interest in Nevada.

Also, on December 4, 2001, an Investment Management Agreement was entered into between Nevada Partners Fund, LLC and Bricolage Capital, LLC, retroactively effective November 29, 2001. This document is signed by David Diamond for Nevada and by Samyak C. Veera for Bricolage Capital. The document retains Bricolage Capital as the investment manager for Nevada.

James Kelley Williams and his son testified that they believed Bricolage, under the leadership of Andrew Beer, who possessed a Harvard Business School MBA, would offer the knowledge and experience to guide the NCR-JKW companies to a more productive investment strategy. Kelley Williams, Jr., produced an economic study of the investment possibilities, a study which resulted in the decision to invest based on

---

[25]As the Administrative Member, BCMC had the power and duty to approve any purchase of the Nevada Fund. *See* the Assignment and Assumption Agreement [Exhibit 32J].

the recommendations of Bricolage. [*See* Exhibit 201J]. This economic study refers to the *fx* trade, the arbitrage and the probability of an incremental return of at least 1% on the illiquid Trust securities and any additional securities or assets so invested. The study offers projections of expected returns based on best, on expected, and on worst case scenarios. The study makes no reference to any tax advantages offered by Bricolage or to any tax purpose for pursuing the strategy. The FOCus steps through the three-tiered partnership simply was not a factor in the investment strategy to be pursued through Bricolage.

A significant portion of the Williams' assets to be considered for investment with Bricolage was the JKW 1991 Revocable Trust, consisting primarily of equity investments which, according to Williams, were not performing well. These assets had a value of approximately $14.5 million dollars. Bricolage proposed that it could do a better job and earn greater returns by reallocating[26] the Trust's investments, de-emphasizing the Trust's concentration in equities, and placing greater emphasis in "alternative investments" such as hedge funds and foreign currency trading. Bricolage explained that it relied on the principle of *mean reversion*[27] to take long positions on trades when the value of the trade was rising, and taking short positions when the value

---

[26]Asset reallocation is one of the services Bricolage offered to perform according to the terms of the Strategic Consulting Agreement. See Exhibit 223D, formerly 223J, the Portfolio Analysis and Recommendation prepared by Aviel Faliks.

[27]This court has located no federal or state case law discussing mean reversion theory. However, as described by witnesses in this case, *Mean Reversion* is the theory that a given value will continue to return to an average value over time, despite fluctuations above and below the average value. For instance, this strategy encourages purchasing underperforming securities, under the premise that the market will eventually rebound, and the value of the security will increase. *See* www.Investorwords.com.

began to fall. *See* Jessica A. Wachter, *Portfolio and Consumption Decisions under Mean-Reverting Returns: An Exact Solution for Complete Markets,* The Journal of Financial and Quantitative Analysis, Vol. 37, No. 1 (Mar., 2002), pp. 63-91, an article discussing optimal portfolio choices using mean reversion strategy.  A discussion of "Mean Reversion Investment Strategies" already had been provided to Williams at the October 2, 2001, meeting conducted by KPMG.  Bricolage explained that this approach focused on arbitrage[28] and other strategies built on the principle that deviations from the norm or mean tend to revert to the mean, and that money could be made on either side of the mean. [Exhibit  216P].

After Williams purchased Nevada, the FOCus steps called for the purchase of Carson by Williams within thirty days.  This step was carried out more quickly, on December 12, 2001.  Carson, the ALT LLC, was to engage in foreign exchange option trades called the Yen Carry Trade, a strategy which was designed to take advantage of the spread in value between the Japanese Yen and the Dollar.  Credit Suisse First Boston was the bank designated to carry out this trading activity.  December 12, 2001, was a significant departure from the KPMG power point presentation since waiting 30 days would have had Williams not purchasing Carson and, per force, Reno until on or

---

[28]An arbitrage is a specialized form of trading based on disparity in quoted prices of the same or equivalent commodities, securities, or bills of exchange.  In its most common form it involves purchase of a commodity against a present sale of the identical commodity for future delivery-time arbitrage; or a purchase in one market, say New York, against a sale in another, such as London-space aribtrage. There is also a third, somewhat less common, form-kind arbitrage. This consists of a purchase of a security which is, without restriction other than the payment of money, exchangeable or convertible within a reasonable time into a second security, together with a simultaneous offsetting sale of the second security. *Falco v. Donner Foundation*, 208 F. 2d 600, 603 (2d Cir. 1953).

after January 4, 2002.  Ostensibly, Williams had made the decision to take the Reno losses in the 2001 tax year.

Next, Williams transferred a large portion of his private equity interests, the Trust assets valued at approximately $14.5 million dollars, as well as cash in the amount of $1,151,143 into Carson.  According to the Bricolage witnesses, investors ordinarily did not make their investment in the form of equities.  Meanwhile, BCMC agreed to waive its usual fees so long as Bricolage Capital remained the investment manager of this arrangement.  The JKW 1991 Revocable Trust purchased Nevada's 99% ownership of Carson for $523,030.33. [See Exhibits 2012J, 2013J and 52J].  Williams became the controlling member of Carson as set forth in the Amended and Restated Operating Agreement entered into on December 12, 2001 [Exhibit 7J].

The purchase of Carson on December 12, 2001, made Williams a 99% owner of Reno and its embedded losses.  However, the $523,030.33 paid for Carson by Williams, plus his equity and cash contributions, did not provide the full investor basis Williams would need in order to take advantage of all the Reno losses.[29]  So, Williams, upon the suggestion of Bricolage, signed a $9,000,000.00 personal guarantee of the Credit Suisse loan of $9,000,000.00 which was to finance the Carson Yen trading.  According to the testimony of Gary Gluck with Credit Suisse, the $9,000,000.00 loan for the Carson foreign currency trade was already collateralized by the gain leg of the option and did not require any personal guaranty.  Nevertheless, Williams provided the guaranty, and this increased his basis in Carson/Reno so that he could take full

[29]See footnote 17 above, discussing *Klamath Strategic Investment Fund ex rel. St. Croix Ventures v. U.S.*, 568 F.3d 537, 542 (5th Cir. 2009), and its reference to Title 26 U.S.C. § 752.

advantage of the embedded losses in Reno.

As previously noted, the $18,000,000 in gains from Reno's foreign currency straddle trade were passed from Reno through Carson to Nevada and were placed in certificates of deposit with Credit Suisse. These gains had been reported for tax purposes for the period from October 22, 2001, to November 21, 2001, by the NCR-Bricolage companies, and prior to Williams' December 12, 2001, purchase of Carson. Williams had no tax liability for these gains. As noted by plaintiffs' counsel, Williams did not receive these gains. Instead, Williams possessed 99% of Reno, the FC LLC, with its embedded losses. These losses are congruent with the prospective losses KPMG believed Williams needed for use against the recapture gain. This agrees with the information set forth in the October 2, 2001, KPMG power point presentation on the FOCus strategy given to Williams and his attorneys by Donna Bruce.

Once the December 4, 2001, purchase of Nevada, and the December 12, 2001, purchase of Carson were completed, as the 99% owner and controlling member of Carson, and, after establishing a sufficient basis in Carson, Williams was able to use the Reno embedded losses. On December 21, 2001, Reno was sold with its embedded losses of $17,188,060, losses which were used to offset the B.C. Rogers Loan recapture and the Williams' 2001 ordinary income. This use of the Reno losses to offset the recapture from a separate transaction drew the scrutiny of the IRS, already concerned about the disappearance of taxable gains among wealthy investors, to the FOCus transaction with regard to Williams, as well as to the NCR-Bricolage companies. Thus, the IRS notified KPMG that it was being compelled to identify the participants in the FOCus program. The question asked by John Beard of KPMG back on October 12,

2001, pertaining to why the FOCus strategy through Bricolage was not subject to Notice 2000-44 and why FOCus was not subject to being reported to IRS as a tax shelter under Title 26 U.S.C. § 6111(a), Exhibit 1327D, proved to be prescient since, on April 12, 2002, IRS notified KPMG that it was being compelled to disclosure of all information pertaining to FOCus, including alll persons participating in it, just as it had done with BOSS, COBRA, Son of BOSS, and so many other such tax strategies in the past. This led to the several final partnership administrative adjustments (FPAAs) to the LLC's tax returns and those of the Williams' for the taxable year ending December 31, 2001.

***Investment with Bricolage Beginning In 2002 - The Asset Reallocation***

As of January of 2002, the lion's share of the JKW 1991 Revocable Trust (46.63%) had been invested in the Russell 1000, an institutional investment index managing over four trillion dollars in assets. The rest of the Trust was invested in government and corporate bonds, CDs, and other equities. This allocation was, according to the testimony of Williams and his son, performing below expectations. Bricolage prepared a Portfolio Analysis and Recommendations, Exhibit 223J, containing the initial asset analysis and reallocation recommendations provided to Williams in January of 2002. According to the IRS, Williams withheld payment of the fee of $845,000.00 to Bricolage for its services in providing the LLC multi-step procedure leading to the embedded losses in Reno until January of 2002 when the reallocation document promised by Bricolage was delivered. This delay of payment created at least the appearance of a connection, if not an actual connection, between the three-tiered LLC transactions of 2001, and subsequent investment activity engaged in by Williams and the NCR-JKW companies with Bricolage from 2002 forward.

36

The reallocation document explains that the goal was to "generate an *efficient frontier* that represents a cross section of efficient portfolios. The most efficient portfolios are the ones that produce the most return for a given level of risk or the least risk for a given level of return." *See* Exhibit 223J. A few investment funds were recommended by Bricolage in the document, including E/MR Partners, L.P., a venture capital entity managed by Bricolage principals Avi Faliks, Andrew Beer, and Samyak C. Veera; UBP Selectinvest, a multi-manager fund of funds, and Catequil Partners, L.P.

At the beginning of 2002, after completing the FOCus steps with the LLCs in December of 2001, Williams had controlling interest in Nevada Partners and Carson Partners (99%). Carson owned interests in two funds, a $360,000 position in E/MR Partners, L.P., and a $528,932.92 position in Reno. While Reno continued to trade in December of 2001, its position dwindled. The Carson FX option trade was closed for a gain of $51,390.00. Reno's was closed with a loss on its current trades ($6,843.64). This resulted is a foreign currency net gain of $44,516.55 in 2002. The Carson position in E/MR Partners eroded over 2002 and was sold at a loss of (63,814.00) in early 2003.

In mid-December, 2001, Bricolage had already asked Williams to consider a set of highly leveraged Japanese Yen transactions designed to take advantage of the difference between the near zero interest rate on Yen borrowed in Japan and higher interest rates in the United States. Exhibit 246J. Williams agreed. While the initial position in the Carson Yen Carry Trade referred to in the previous paragraph was liquidated, continued investment recommended by Bricolage in 2002 and designed to take advantage of the in the Yen/Dollar spread ultimately would earn Williams $8,000,000.00. Williams testified that he paid the taxes on the Carson trades and there

is no claim by the IRS that tax is due on this activity. This investment activity was carried on independently of the 2001 FOCus steps.

In January of 2002, Williams' son oversaw the initial investments with Bricolage, starting with a $1,100,000.00 investment, placing $550,000.00 with Hunter Global Fund and $550,000.00 with Pinnacle Fund. Bricolage had recommended the Hunter Global Fund and operated the Pinnacle Fund itself. According to the "greater investment focus" document provided to the court by Williams at the beginning of trial, these two investments earned $527,937.00 and $148,602.00, respectively. Another 2002 investment with Selectinvest ARV earned $256,419.00. Thus, the journey down a very successful investment road had begun, but in January of 2002, not in December of 2001.

From 2002 through 2007, the NCR-JKW companies continued to enjoy great success. For example, in early 2004, the NCR-JKW companies invested in Helios Energy Partners and between 2004 and 2007 enjoyed a gain of $8,027,976.00. Investment in the Centaurus Fund earned $1,246,930.00 from 2003 to 2004. The investment in Five States Energy earned $1,808,521.00 from late 2003 to the end of 2007. Between 2002 and 2007 the Williams association with Bricolage and its principals resulted in gains of approximately $23,000,000.00. Taxes on these earnings were paid and the IRS makes no claims on these earnings.

***Separation Between the LLC/FOCus Steps and Subsequent Investment Activity***

The factual issue which underlies all the evidence and testimony presented in this case is whether Williams, as contended by IRS, participated in a pre-packaged tax shelter that was developed, promoted, and sold by KPMG/Bricolage. Williams argues

that all the transactions at issue were legitimate investments intended to reduce market risks and make profit. However, as noted by counsel for Williams at the beginning of this case, an investment of $51,000,000.00 resulted in gains of over $23,000,000.00. All of this investment activity took place subsequent to the completion of the FOCus steps in 2001.

The evidence clearly shows a division, a line of demarcation, between the events from December 4, 2001 to December 21, 2001, and the investment activity that took place after January 1, 2002. Either set of events could have taken place wholly without the other. Nevertheless, the plaintiffs have argued that they must be viewed as one continuous strategy, both the FOCus steps and the subsequent investment with Bricolage.

Additionally, this court is mindful of the timing employed by Bricolage through the NCR-Bricolage companies once KPMG informed Bricolage of the Williams' interest in the FOCus strategy. The FOCus steps began in October of 2001 with step three, the foreign currency straddle undertaken by the NCR-Bricolage companies through Reno. This was strategically accomplished before the purchase of Nevada by Williams on December 4, 2001. Significantly, for our purposes here, this third step is the one that embedded the losses which might be sought by a wealthy investor. In this case Williams was that investor, someone who needed those losses to offset the recapture he was to realize from a wholly separate, unrelated transaction, notwithstanding his very proper and successful investment activity with Bricolage after January of 2002.

## GENERAL LEGAL STANDARDS

The first of at least three legal standards governing this court's analysis is that,

39

"while it is axiomatic that taxpayers lawfully may arrange their affairs to keep taxes as low as possible," *Gregory v. Helvering*, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596 (1935), the issue in any such dispute as this is whether the arrangement in question was accomplished in a lawful manner.

Next, this court recognizes that partnerships do not pay income tax. Instead, the individual partners in a partnership are "liable for income tax only in their separate or individual capacities." *See* Title 26 U.S.C. § 701. However, "[e]very partnership (as defined in section 761(a)) shall make a return for each taxable year, stating specifically the items of its gross income and the deductions allowable by subtitle A, and such other information for the purpose of carrying out the provisions of subtitle A as the Secretary may by forms and regulations prescribe, and shall include in the return the names and addresses of the individuals who would be entitled to share in the taxable income if distributed and the amount of the distributive share of each individual. Title 26 U.S.C. § 6031(a).

Additionally, the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA) was enacted to provide consistency in the treatment of partnership items through a single unified proceeding. TEFRA, Pub.L. No. 97-248, 96 Stat. 324 (1982) (codified as amended at Title 26 U.S.C. §§ 6221-34 (2006)). Prior to the enactment of TEFRA, "administrative and judicial proceedings related to partnership income were ... conducted at the level of the individual partner," resulting in the need to initiate multiple proceedings to address the tax issues of a single partnership. *See Monti v. United States*, 223 F.3d 76, 78 (2d Cir. 2000). Under § 6221 of the Internal Revenue Code, "The tax treatment of any partnership item (and the applicability of any penalty, addition

to tax, or additional amount which relates to an adjustment to a partnership item) shall be determined at the partnership level." Title 26 U.S.C. § 6221. Adjustments to partnership items are made by the IRS in a Final Partnership Administrative Adjustment (FPAA). Title 26 U.S.C. § 6223(a). "The point of the FPAA process is to make determinations which simultaneously are binding on all partners within the partnership." *Russian Recovery Fund Ltd. v. United States,* 81 Fed. Cl. 793, 799 (2008).

### CONSIDERATION OF ECONOMIC SUBSTANCE, SHAM TRANSACTIONS AND SUBSTANCE OVER FORM

In order to be accorded recognition for tax purposes, a transaction generally is expected to have "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." *Frank Lyon Co. v. United States*, 435 U.S. 561, 583-584, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978); This principle is known as the "economic substance doctrine." A taxpayer is not permitted to reap tax benefits from a transaction that lacks economic substance. *Coltec Industries, Inc. v. United States*, 454 F.3d 1340, 1352-55 (Fed. Cir. 2006).

"[W]hen applying the economic substance doctrine, the proper focus is on the particular transaction that gives rise to the tax benefit, not collateral transactions that do not produce tax benefits." *Klamath Strategic Investment Fund v. United States*, 568 F.3d 537, 545 (5th Cir. 2009). If the taxpayer enters into a transaction that does not appreciably affect his beneficial interest except to reduce his tax, the law will disregard it; for we cannot suppose that it was part of the purpose of the act to provide an escape from the liabilities that it sought to impose. *Weller v. Commissioner*, 270 F.2d 294, 297

(3d Cir. 1959). Courts should not "reward a 'head in the sand' defense where taxpayers can profess a profit motive but agree to a scheme structured and controlled by parties with the sole purpose of achieving tax benefits for them." *Klamath*, 568 F.3d at 544-45 (adopting the majority view "that a lack of economic substance is sufficient to invalidate the transaction regardless of whether the taxpayer has motives other than tax avoidance"). Any profit motive of a partnership is to be determined at the partnership level. *Id.*, at 550.

The economic substance doctrine requires "disregarding, for tax purposes, transactions that comply with the literal terms of the tax code but lack economic reality," and, thus, "prevent[s] taxpayers from subverting the legislative purpose of the tax code by engaging in transactions that are fictitious or lack economic reality simply to reap a tax benefit." *Coltec,* at 1352-54.

So, a lack of economic substance is sufficient to invalidate the transaction (finding it to be a "sham") regardless of whether the taxpayer has motives other than tax avoidance. *Klamath*, 568 F.3d at 544, citing *Coltec*, 454 F.3d at 1355; *United Parcel Serv. of Am., Inc. v. Comm'r*, 254 F.3d 1014, 1018 (11th Cir. 2001); and *ACM Partnership v. Comm'r*, 157 F.3d 231, 247 (3d Cir. 1998).

The sham transaction doctrine is a common law "substance over form" doctrine created by the United States Supreme Court in *Gregory v. Helvering.* "A sham transaction is one which, though it may be proper in form, lacks economic substance beyond the creation of tax benefits." *Karr v. Commissioner*, 924 F.2d 1018, 1022-1023 (11th Cir.1991). To determine whether a transaction is merely an economic sham, this court must determine whether the transaction had any practical economic effect other

than the creation of tax benefits.  One method of doing this is to  examine the objective economic substance of the transaction, compared to the subjective business motivation of the taxpayer.  The Fifth Circuit requires a taxpayer to establish *that the transaction in question had a reasonable possibility of profit* (the so-called "objective" economic substance test) and that the taxpayer was motivated to enter into the transaction for a legitimate non-tax business purpose (the so-called "subjective" test).  *See Klamath*, 568 F.3d at 544, adopting the majority view that the court must set up a multi-factor test for when a transaction must be, or not be, honored as legitimate for tax purposes, with factors including whether the transaction (1), has economic substance compelled by business or regulatory realities;  (2), is imbued with tax-independent considerations; and (3), is not shaped totally by tax-avoidance features.  *Id*., citing *Frank Lyon*, 435 U.S. at 583-84.  The *Klamath* Court noted that these factors are phrased in the conjunctive, meaning that the absence of any one of them will render the transaction void for tax purposes.  Thus, if a transaction lacks economic substance compelled by business or regulatory realities, the transaction must be disregarded even if the taxpayers profess a genuine business purpose without tax-avoidance motivations.  *Id*.

Next, a key principle in tax law is that the incidence of taxation depends upon the substance of a transaction rather than its form.  *Gregory v. Helvering*, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596 (1935);  *Freytag v. Comm'r*, 904 F.2d 1011, 1015 (5th Cir. 1990), *aff'd on other grounds*, 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991) ("The fundamental premise underlying the Internal Revenue Code is that taxation is based upon a transaction's substance rather than its form.  Thus, sham transactions are not recognized for tax purposes ...").  There are at least three iterations

of the substance over form doctrine, which include, (1) the conduit theory; (2) the step transaction doctrine, and (3) the economic substance doctrine. *Enbridge Energy Co., Inc. v. United States*, 553 F.Supp.2d 716, 726 (S.D. Tex. 2008).

In the instant case, the IRS challenges the FOCus step transactions based on their substance as a cover for the creation of tax losses not actually incurred by the taxpayer. In *Crenshaw v. United States*, 450 F.2d 472 (5th Cir.), *cert. denied*, 408 U.S. 923, 92 S.Ct. 2490, 33 L.Ed.2d 333 (1972), the Fifth Circuit stated that, "[t]o permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress." *Id.*, 450 F.2d at 475. The *Crenshaw* Court also noted that, "when an illusory facade is constructed solely for the purpose of avoiding a tax burden the astute taxpayer cannot thereafter claim that a court is bound to treat it as being a genuine business arrangement." *Id.*

## APPLICABLE AND PERSUASIVE CASE LAW

### *Kornman & Associates, Inc. V. United States*

In the recent decision of *Kornman & Associates, Inc. v. U.S.,* 527 F.3d 443, 446 (5th Cir. 2008), the United States Court of Appeals for the Fifth Circuit dealt with a taxpayer/partner's 1999 attempt to treat a short sale of treasury bonds as a tax loss instead of a partnership liability. The Fifth Circuit noted that the taxpayer acknowledged suffering a loss of only $200,000.00 on the actual treasury bond short sale. The taxpayer had used $2,000,000.00 to leverage a $102.6 million dollar short sale. Then through a series of contrived steps (a variant of the Son of BOSS strategy), the taxpayer had passed the obligation to replace the borrowed shares into other

partnership entities. As with any short sale, the taxpayer was obligated to buy an equivalent number of shares at the close of the short transaction in order to return the number shares borrowed in the leveraged short sale. By passing this obligation off through the series of step transactions, the taxpayer carried the obligation to replace the treasury bonds it had borrowed as a loss instead of a liability, and claimed a $102.6 million tax loss on its return. The taxpayer then used this contrived 1999 loss to offset over $2 Million of its legitimate income and capital gains in 2000 and 2001. The taxpayer continued to use the balance of the liability against future gains until the IRS mailed notices of final partnership administrative adjustment (FPAAs) to the taxpayer. The taxpayer's "premeditated attempt," said the Fifth Circuit, "to transform this wash transaction (for economic purposes) into a windfall (for tax purposes) is reminiscent of an alchemist's attempt to transmute lead into gold." *Kornman*, 527 F.3d at 456.

The Fifth Circuit cited IRS Notice 2000-44, stating that this notice warned taxpayers that a particular form of the contrived steps scheme called the "Son of BOSS" tax ("Bond and Option Sales Strategy) shelter was abusive. The Fifth Circuit explained that the Son of BOSS strategy, "uses a series of contrived steps in a partnership interest to generate artificial tax losses designed to offset income from other transactions." *Id.*, at 446 fn 2. The IRS rejection of this type tax avoidance strategy was noted by the Fifth Circuit.

The *Kornman* decision specifically counsels the taxpayer that the obligation to close a short sale is a liability for purposes of the relevant tax law[30] as soon as the

---

[30]The applicable law in *Kornman* was, among other provisions, Title 26 U.S.C. § 752, the provision for treatment of liabilities by partnerships.

obligation arises, and cannot be held on the taxpayer's books to be used like actual economic losses.  More broadly, the decision serves to inform the courts that transactions of a similar nature, particularly those pursued by taxpayers in the 1999-2001 time frame, would not pass IRS scrutiny.

### Chew v. KPMG, LLP

The case of *Chew v. KPMG, LLP*, 407 F.Supp.2d 790 (S.D. Miss. 2006), involves a factual scenario very similar to the instant case.  KPMG offered the Chew family the opportunity to participate in a tax eliminating strategy, a tax shelter promoted and offered only to wealthy clients.   The tax shelter, known as the Offshore Portfolio Investment Strategy or "OPIS", involved a series of steps consisting of foreign investments and re-investments (investments and re-investments in securities of entities outside of the United States ) in an attempt, through use of Internal Revenue Code provisions, to inflate the cost basis of the client's investment.  When the investment was sold,  the client appeared to realize a capital loss for income tax purposes, based on the inflated cost basis.  The capital loss then was available to be applied to capital gains realized in other, separate transactions.

In 2001, the IRS offered a "disclosure initiative" which allowed participants in the OPIS and similar investment strategies the opportunity to disclose information regarding their transactions.  In return, the IRS would forego assessing penalties based on the transactions. In April 2002, the Chews enrolled in the disclosure initiative program. In October 2002, the IRS initiated another plan under which it offered to finally settle the

dispute by allowing OPIS participants to avoid penalties and to recognize approximately twenty percent of claimed capital losses relating to their OPIS transactions. The Chews accepted this offer and, as a result of the ensuing IRS audit, paid over sixteen million dollars in back-taxes and interest. *Chew*, 407 F.Supp. at 794.

The Chews then filed suit against KPMG in the Circuit Court for the First Judicial District of Hinds County, Mississippi, on January 28, 2004. The case was removed to this court and the motion to remand the case was denied. The issue before this court was whether an arbitration clause in the KPMG agreement with the Chews governed the dispute. The Honorable William H. Barbour, United States District Judge, ruled that arbitration should be compelled. However, for the purposes of the instant case, this court's attention is drawn to Judge Barbour's recitation of the factual backgound which gave rise to the lawsuit. Reading from the complaint in the case, Judge Barbour noted that the scheme of KPMG was to market so called tax eliminating investments to wealthy clients. Judge Barbour then outlined the scheme as follows:

> KPMG would market the transaction to long-term wealthy clients of itself and the other participants. Presidio (like Bricolage), as the investment advisor, provided the design and rhetoric to recast the tax strategies as investment strategies. The Deutsche (Bank) Defendants (like Credit Suisse First Boston) would provide financing and nominal investment transactions that provided the investment "cover" to disguise the tax driven motives. Brown & Wood (like Arnold & Porter) would provide the purportedly "independent" opinion letters blessing the strategy and supposedly insulating the clients from Internal Revenue Service ("IRS") penalties in the event of an audit.

*Id.*, at 794.

This court could simply substitute the names of the major players in the instant case and Judge Barbour's factual recitation would be congruent with the instant case..

Judge Barbour noted further that KPMG, along with Brown & Wood, advised the Chews that, as a result of [their investments in the OPIS], it was proper to utilize the losses generated by the OPIS transaction on the Chew's tax returns [for 1998 and 1999].  However, as in the instant case, the IRS took the position between 1999 and 2002, that losses based on investment strategies such as the OPIS were invalid and lacking in business purpose.

***Freytag v. Commissioner of Internal Revenue***

*Freytag v. C.I.R.,* 904 F.2d 1011 (5th Cir. 1990), *cert. denied.* 501 U.S. 868, 111 S.Ct. 2631, 115 L.Ed.2d 764 (1991), involved pre-1982 commodity straddles, but the treatment of these transactions by IRS is instructive here.  Four of approximately 3,000 taxpayers sought redetermination of deficiencies assessed against them for deducting losses allegedly realized from investments in straddles in forward contracts offered by an investment manager named First Western Government Securities.  In the typical scenario, investors who sought losses to apply against anticipated taxable gains would provide First Western with a "margin" deposit.  Although a margin typically neither limits an investor's potential liability nor is linked to tax considerations, the "margins" paid by First Western's investors *were a percentage of their desired tax loss* and represented their total liability for trading losses.  First Western assessed trading fees against the "margin" until a stated "fee cap" was reached, after which no fees were assessed.  *Id.*, at 1013.  *When the loss leg of an investor's straddle achieved the desired tax loss, First Western would cancel the contract to ensure the investor a tax loss for the year.*  Once

48

the gain leg generated the desired amount of capital gain, First Western would assign the contract to one of three financial entities maintaining an account with it for this specific purpose. First Western would close out the contract with the assignee, credit the assignee's account with one percent of the proceeds, and then credit the remaining 99 percent to the investor. No money changed hands.

First Western successfully obtained tax losses for its investors remarkably close to their stated tax preferences for which they had paid the margin fee. However, the IRS determined First Western's program to be a sham and denied the deduction of losses resulting from its transactions.

The *Freytag* Court accepted the IRS finding of a sham transaction, noting that First Western's absolute authority over the pricing and timing of the transactions that occurred in the self-contained market of its own making enabled it to achieve the tax losses desired by its investors with uncanny accuracy. So, the Tax Court's recognition that First Western's program made available to its investors an essentially risk-free opportunity to purchase tax deductions, said the *Freytag* Court, was not clearly erroneous. "Bathed in the harsh light of economic reality," said the court, "the Taxpayers' other factual arguments amount to nothing more than a valiant effort to substitute the testimony of their expert witnesses for the findings of the Tax Court." *Id.*, at 1016.

This holding in *Freytag* presages the Fifth Circuit ruling in the *Kornman* case, as well as the circumstances of the instant case, particularly with regard to the application of generated tax losses for use against capital gains realized in unrelated transactions.

**New Phoenix Sunrise Corp. v. Commissioner of Internal Revenue**

*New Phoenix Sunrise Corp. v. C.I.R.,* 132 T.C. No. 9, 2009 WL 960213 (U.S. Tax Ct. 2009), is a revenue ruling. "Revenue Rulings do not have the presumptive force and effect of law but are merely persuasive as the Commissioner's official interpretation of statutory provisions." *Kornman*, 527 F.3d at 453, citing *Sealy Power, Ltd. v. Comm'r*, 46 F.3d 382, 395 (5th Cir. 1995). Nevertheless, federal courts usually "accord significant weight to the determination of the IRS in its revenue rulings." *Id.*, citing *St. David's Health Care System v. U.S.*, 349 F.3d 232, 239 n. 9 (5th Cir. 2003). In the Fifth Circuit, revenue rulings are "entitled to respectful consideration" and are generally "given weight as expressing the studied view of the agency whose duty it is to carry out the statute." *Id.*

*New Phoenix* involved a complicated set of steps where the taxpayer, anticipating a ten million dollar gain in 2001 from the sale of assets in a wholly owned subsidiary S corporation, purchased a long option and sold a short option in foreign currency through a foreign bank, paying only the net premium to the foreign bank for each transaction. The taxpayer then formed a partnership and transferred the long and short options to the partnership. Ultimately, the long and short options offset one another and expired. The taxpayer dissolved the partnership, distributed its assets to the partners, including stock not related to the foreign currency trade, and attempted to claim a $10,000,000.00 loss from the distribution of the partnership assets. The IRS issued a notice of deficiency to the taxpayer's subsidiary, and the taxpayer petitioned for review on a consolidated return which included the subsidiary. Nevertheless, IRS disallowed the losses generated and claimed from the asset distribution to the partners

50

upon dissolution of the partnership.

The Tax Court in *New Phoenix* recounted the various notices to taxpayers provided by IRS which instructed taxpayers on the propriety of using offsetting options to create non-economic losses. The first notice, said the Tax Court, was issued on February 28, 2000. The Department of the Treasury issued temporary regulations requiring corporate taxpayers to disclose transactions listed in the notice. Sec. 301.6111-2T, Temporary Income Tax Regs., 65 Fed.Reg. 11218 (Mar. 2, 2000). Then, Notice 2000-44, 2000-2 C.B. 255, was issued on August 11, 2000, and published in the Internal Revenue Bulletin on September 5, 2000. The notice warned taxpayers of transactions calling for the simultaneous purchase and sale of offsetting options which were then transferred to a partnership. The notice determined that the purported losses from such offsetting option transactions did not represent bona fide losses reflecting actual economic consequences and that the purported losses were not allowable for federal tax purposes.

### *Killingsworth v. Commissioner of Internal Revenue*

*Killingsworth v. Commissioner of Internal Revenue*, 864 F.2d 1214 (5th Cir. 1989), involved a foreign metal commodities straddle designed to produce ordinary losses for use against unrelated ordinary income. The Fifth Circuit agreed with the IRS, observing that the transactions at issue "'consisted of nothing more than the sale for a fee of tax deductions to American taxpayers. An examination of the record likewise leads us to the conclusion that the transactions had no real economic effect on the taxpayers other than the conference of tax advantages.'" *Id.*, at 1218-19.

*Killingsworth* demonstrates that the IRS has a history of rejecting tax deductions

from transactions which are entered into for the purpose of generating losses for use against gains from other, unrelated transactions, or against unrelated ordinary income. In the instant case the losses generated by the Reno straddle were used both against unrelated personal ordinary income and a recapture from an unrelated transaction.

**Jade Trading, LLC v. United States**

In *Jade Trading, LLC v. United States*, 80 Fed. Cl. 11 (2007), the tax court dealt with and rejected a "spread transaction" which involved the purchase and sale of foreign currency options, creating a spread position, which then was contributed to a partnership. When the investor exited the partnership, a marketable asset was received which had a high-basis and low value, the sale of which would generate an apparent  loss.

Additionally in *Jade Trading*, the investment advisor, BDO Seidman, had its lawyers prepare a 37-page tax opinion for potential investors in the spread transaction. The opinion briefly described the investment aspects of the spread transaction, the type of options to be purchased and sold, the strike price for each option, the dollar and euro value of each option, the expiration dates of the options, and profit potential of the transaction.  The opinion also detailed the predetermined steps to be taken as follows:

> 1) Investment in Foreign Currency, 2) Contribution to a Partnership, 3) Partnership Investments, 4) Termination of Partnership Interests. The opinion explained that the investor would first "purchase a European-style call option" and at "the same time ... sell a European-style call option." The investor would then contribute the purchased and sold call options to a partnership that had been previously formed under Delaware law. "Sentinel Advisors [would be] the investment advisor to the Partnership,

52

and [would] charge the Partnership an investment advisory fee." In return
for the options contribution the investor would receive a "less than 50%
interest in the partnership."

In the fourth step of the BDO Spread Transaction, "Termination of
Partnership Interests," the purchaser of the spread would exit the
partnership, receive an asset with a claimed high-basis and low-value,
*and then sell that asset in order to generate a tax loss*.

The similarity of the strategy in *Jade* to the Bricolage strategy in the instant case cannot
be overlooked, particularly when the ultimate goal was to generate losses to be used
against gains in unrelated transactions.

### Stechler v. Sidley Austin Brown & Wood, LLP

*Stechler v. Sidley Austin Brown & Wood, LLP*, Not Reported in F.Supp.2d, 2006
WL 90916 D.N.J.,2006, is a lawsuit by a taxpayer against a company for marketing a
tax elimination strategy which did not pass IRS scrutiny.  The district court noted that
the strategy was marketed to wealthy individuals who had realized large capital gains.
One of  the purported goals of the strategy was to generate a large capital loss which
then would be used to eliminate or reduce a taxpayer's capital gains from unrelated
transactions.

### Kligfeld Holdings v. C.I.R.

*Kligfeld Holdings v. C.I.R.,* 128 T.C. No. 16, 128 T.C. 192 (U.S. Tax Ct.  2007),
involved a taxpayer who contributed encumbered assets to a partnership, then
disposed of the small amount of equity which had been transferred to the partnership.
This left the encumbered portion of those assets on the books of the partnership.  The
taxpayer then sold the partnership and claimed the remaining encumbrances as losses

which he used to offset the taxpayer's future large gains in other unrelated transactions. The tax court noted that in 1999 the IRS began to notice that very large amounts of capital gains seemed to be disappearing from the nation's tax base via strategies where large "not-out-of-pocket" losses were created in order to offset large gains and eliminate tax liability, and set about publishing notices that these types of transactions would not be recognized for tax purposes. Significantly, these very same notices were known to the plaintiffs' advisors in the instant case.

**Sala v. U.S.**

In *Sala v. U.S.*, Not Reported in F.Supp.2d, 2007 WL 1970317 (D. Colo. 2007), the district court referred to a criminal case in the Southern District of New York, *United States v. Stein*, S105 cr 888(LAK) (S.D.N.Y.) 2005), where the IRS had indicted several accountants and lawyers, *as well as the accounting firm KPMG*, on numerous counts all related to developing and promoting a series of fraudulent tax shelters. The *Sala* court noted that the IRS first notified KPMG that it was under investigation for its tax shelter activities on October 17, 2001. Thus, at the time KPMG was giving FOCus advice to James Kelley Williams, it knew the IRS was investigating its tax shelter marketing.

Then on February 5, 2002, the IRS notified KPMG that it was expanding the scope of this investigation to cover "KPMG's liability *with regard to all tax shelter activities from January 1, 1994 to the present*." Of course, this included FOCus even though it was not listed specifically as one of the schemes the IRS had taken action against. Significantly, the *Sala* court regarded the discovery requests broad enough to include the unlisted strategy before it in that case (the "Deerfield" strategy).

### RA Investments I, LLC v. Deutsche Bank AG

In *RA Investments I, LLC v. Deutsche Bank AG*, Not Reported in F.Supp.2d, 2005 WL 1356446 (N.D. Tex. 2005), the plaintiffs asserted claims for damages resulting from "tax strategies involving certain foreign exchange digital option contracts" which the complaint referred to as "FX Contracts" or "COBRA" (Currency Options Bring Reward Alternatives). The lawsuit was brought under RICO and had pendent state claims.

The plan to develop and sell the FX Contracts was marketed primarily by the Deutsche Bank in the mid-to-late 1990s. The "COBRA" strategy involved several steps. First, the taxpayer sold a short option and purchased a long option on foreign currency, with different strike prices, in almost identical amounts on a foreign currency exchange, both options to expire in thirty days. Second, the taxpayer contributed his or her options to a general partnership formed for the purpose of conducting the "COBRA" transaction through the Deutsche Bank. After thirty days, the options would expire, resulting in either a gain or a loss.

Third, the taxpayer made a capital contribution, consisting of cash or other capital assets, to the partnership, increasing the taxpayer's basis in order to have full benefit of the losses generated. Fourth, the taxpayer contributed his or her interest in the partnership to an S Corporation formed for this purpose, causing the termination of the partnership. Finally, the S Corporation sold the capital assets contributed by the taxpayer and realized a large loss. Although the taxpayer did not suffer any out-of-pocket loss in this transaction, he used the losses to offset future gains. IRS disallowed these losses.

***The Moss Adams CPA Firm Did Things Correctly***

In *Swartz v. KPMG, LLC*, 401 F.Supp.2d 1146 (W.D. Wash. 2004), a taxpayer

action against KPMG and others under RICO and the Washington Consumer

Protection Act, as well as state law causes of action, the district court noted that the

taxpayer's usual accountant, Moss Adams, was made aware of the taxpayer's interest

in participating in another KPMG strategy called BLIPS (Bond Linked Issue Premium

Structure) which was designed to create artificial economic losses which would offset

his capital gains and diminish his tax liability. Moss Adams called this entire tax

reduction strategy into question. On August 25, 2000, Moss Adams, informed by

existing tax notices, sent the taxpayer a letter questioning the validity and legitimacy of

the tax opinions provided to the taxpayer by KPMG and Brown & Wood. Moss Adams

also advised the taxpayer of the contents of IRS Notice 2000-44 and offered the

opinion that the IRS would not consider the losses generated by BLIPS to constitute

bona fide losses for tax purposes.

## ANALYSIS

Inasmuch as tax deductions are a matter of legislative grace, a taxpayer has the

burden of proving that he is entitled to the deductions claimed. *INDOPCO, Inc. v.

Commissioner*, 503 U.S. 79, 112 S.Ct. 1039, 1043, 117 L.Ed.2d 226 (1992); *New

Colonial Ice Co. v. Helvering*, 292 U.S. 435, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934).

Only when a taxpayer introduces credible evidence with respect to a factual issue will

the Commissioner have the burden of proof with respect to that issue. Title 26 U.S.C.

§ 7491(a)(1).

In the instant case, the IRS issued FPAAs against Williams and the NCR-

Bricolage companies. The FPAAs are the functional equivalent of a notice of deficiency. *Sealy Power, Ltd. v. Commissioner*, 46 F.3d 382, 385-86 (5th Cir. 1995) (affirming a Tax Court's ruling that the FPAA, which involved deductions and credits rather than unreported income, did not shift the burden of going forward with the evidence to the IRS). *Sealy*, 46 F.3d at 387. A notice of deficiency issued by the IRS is, "generally given a presumption of correctness, which operates to place on the taxpayer the burden of producing evidence showing that the Commissioner's determination is incorrect." *Id.*

### The Reno Straddle

This court's primary focus in this matter, in accordance with *Klamath*, has been on the transaction that gave rise to the tax deduction claimed by Williams, the multi-step FOCus strategy carried out in conjunction with the three-tiered partnership structure of Nevada, Carson and Reno, between October and December of 2001. The IRS has argued strongly that the FOCus steps lacked any reasonable expectation of profit and instead was established to shelter an $18 million recapture, plus Williams' ordinary income, from taxation for the 2001 tax year. The experts for IRS, Dr. Colin Blaydon, a Professor of Management at the Tuck School of Business, Dartmouth College, and Dr. Timothy Weithers, an economist from the University of Chicago who directs the graduate program on Financial Mathematics there, have testified at length to establish that the Focus steps, particularly the Reno foreign currency straddle and the Carson foreign currency option trades, lacked economic substance and served no other purpose than to provide the structure through which Williams could enjoy the reduction of his tax burden fore the year 2001.

57

The plaintiffs have attempted to justify linking the 2001 Focus steps with their post 2002 investment activity. They contend that the Reno transactions had a great profit potential. With such a potential, the plaintiffs submit that profit, not tax reduction, was their goal regarding the Reno transactions. The plaintiffs' expert Todd Deiterich opined that the foreign currency straddle conducted by Reno had a profit potential ranging from $600,000.00 to $1.4 million dollars. The plaintiffs further note that, through Carson, after the disposition of Reno, the Yen trading Bricolage recommended after 2002, ultimately earned Williams $8.2 million dollars. Counsel for Williams emphasizes that the IRS experts offered no range of profit for the Reno straddle.

Of course, the reason the IRS expert witnesses offered no profit range for the Reno foreign currency straddle is that the initial Reno transactions, conducted by the NCR-Bricolage companies between October and December of 2001, were not intended to result in profit, and already had another purpose, the generation of losses to be suspended in Reno and sold to a potential investor. The Reno straddle transaction in 2001 had no profit potential for Williams and was, for Williams' purposes, cash flow negative.

Furthermore, the Reno foreign currency straddle and the Carson foreign currency trades initiated and conducted by the NCR-Bricolage companies from October to December of 2001 were not part of the highly successful Yen trading through Carson in which Williams participated after 2002. This trading was unrelated both in purpose and outcome to the Reno straddle.

**The Carson 2001-2002 Foreign Exchange Trades**

Next, the plaintiffs tout the foreign exchange trading conducted through Carson

58

as proof of economic substance of the FOCus steps. This investment consisted of a loan of over one billion Japanese Yen which was converted into $9 million U.S. dollars. The dollars then were deposited and earned a U.S. interest rate. After a period of time, usually two to three months, the invested U.S. dollars, having earned interest at U.S. interest rates, would be converted back to enough Yen to pay off the Yen loan. The remaining dollars not needed to pay back the Yen loan was be the profit.

While the U.S. dollars were invested in this manner, a potential risk existed from the possibility of an unfavorable change in the Yen/U.S. dollar exchange rate. This potential risk was avoided by the imposition of a "collar", which limited not only potential loss, but also the amount of gain. IRS expert Dr. Timothy Weithers explained that the name "collar" means a bracket. Usually, he said, an exposure is bracketed or collared in within a certain range. Thus, said Weithers, the Carson collar provided protection against the Yen getting stronger against the dollar and nullifying any of the gains that could be realized on the spread between the respective interest rates on deposits in Japan and the U.S.

Weithers noted further that the collar in this case consisted of the borrowing of Yen, the conversion of the Yen to U.S. dollars, the acquisition of a "deep-in-the-money call spread[31]" and the collar. According to Weithers, Credit Suisse, as the

---

[31]An option with an exercise price, or strike price, significantly below (for a call option) or above (for a put option) the market price of the underlying asset. Significantly, below/above is considered one strike price below/above the market price of the underlying asset. For example, if the current price of the underlying stock was $10, a call option with a strike price of $5 would be considered deep in the money. *See* http://www.investopedia.com/terms.

counterparty[32] who conducted this trade, was concerned about its thin capitalization and the ability of Carson to meet its obligations. So, Credit Suisse required Carson to post $89,000.00. The maximum profit possibility, said Weithers, was $77,065, while the maximum loss was about $90,000. Weithers noted that the market did move in a way that was advantageous. The exchange rate moved up and the Yen weakened. By February of 2002, the decision was made by Credit Suisse to realize the profits on the trade, and the net amount of this profit was $51,360.

The plaintiffs tout this transaction as a $51,000 dollar return on a purported $89,000 dollar investment. The $89,000.00, however, had another purpose. The maximum possible loss to Carson in this trading, as noted by Weithers, was $90,639.85. This loss, which was limited by the collar, could have occurred if the dollar had weakened against the Yen. So, Credit Suisse had Carson put up $89,000.00 as security. The amount of money actually invested by Credit Suisse to purchase Yen and generate the $51,000 profit was about $9,000,000.00. Carson did not make an investment. Instead, Carson put up security to guard against the possibility of up to $90,000.00 dollar loss, thereby protecting Credit Suisse from any possible loss. As stated by Gary Gluck of Credit Suisse, his primary duty when conducting these types of trades was to be sure the bank suffered no loss.

The plaintiffs have urged this court to view this matter in light of the decision in *Compaq Computer Corporation v. Commissioner*, 277 F.3d 778 (5th Cir. 2001). In this

---

[32]The counterparties in financial transactions known as forwards or swaps are the banks or corporations that make deals between themselves to protect future cash flows or currency values. *See* http://financial-dictionary.thefreedictionary.com/Counterparty.

case, the taxpayer (Compaq) purchased shares of a foreign corporation using an intermediary. The evidence established that the intermediary had approached Compaq about buying the stock and that the intermediary "[w]ithout involving Compaq ... chose both the sizes and prices of the trades and the identity of the company that would sell the [shares] to Compaq." *Id.* at 779-80. The investment resulted in capital losses and in foreign tax being paid for which a foreign tax credit could be claimed. As in the instant case, the IRS argued that the transaction had no economic substance and should be disregarded because the taxpayer was seeking only the foreign tax credit.

The Fifth Circuit in *Compaq* concluded that even if the foreign stock purchase was through an intermediary who had total control of the investment, and even though only a capital loss ultimately was realized on the investment, the taxpayer was still entitled to take the foreign tax credit and have tax benefit of the losses because the transaction was motivated by a business purpose unrelated to obtaining tax benefits, the possibility that the stock price would go up. This, in the Fifth Circuit's view, constituted sufficient economic substance. *Id.* at 781-82. Thus, the transaction was not viewed as mere formality or artifice to generate loss. *Id.* at 788.

The plaintiffs argue that the instant case should be viewed in the same light as *Compaq*, especially in light of the $51,000.00 Carson profit. However, the transaction described in *Compaq* was not the same as the overall transaction in the instant case and did not involve a series of steps through a tiered partnership structure.

Moreover, an individual taxpayer's intent, such as Williams' assertion that his only interest was improved investment performance, is not necessarily the same as the partnership's intent in this case. Between October and December of 2001, the NCR-

61

Bricolage companies were engaged in generating the embedded losses in Reno, while making Carson and Nevada appear gainfully employed.  The lack of economic substance of the partnership transactions which later led to Williams' substantial underpayment of taxes may have been completely unknown to him at the time the transactions were executed. *See Weiner v. United States*, 255 F.Supp.2d 673, 679 (S.D. Tex. 2002); *aff'd in part, rev'd in part on other grounds, and remanded for further proceedings*, 389 F.3d 152 (5th Cir. 2004).

Finally, even if this court accepted the contention that Carson's sole purpose was profit, the artificial loss in Reno would remain.  This artificial loss is unrelated to the Carson foreign exchange trades.  *See Coltec Indus., Inc. v. United States*, 454 F.3d at 1358.   As stated by the Fifth Circuit in *Klamath,* "courts should not 'reward a 'head in the sand' defense where taxpayers can profess a profit motive but agree to a scheme structured and controlled by other parties with the sole purpose of achieving tax benefits ... .'"  *Klamath*, 568 F.3d at 544-45 (adopting the majority view "that a lack of economic substance is sufficient to invalidate the transaction regardless of whether the taxpayer has motives other than tax avoidance") (citing *Coltec*, 454 F.3d at 1355; *United Parcel Serv. of Am., Inc. v. Comm'r*, 254 F.3d 1014, 1018 (11th Cir. 2001); *ACM Partnership v. Comm'r*, 157 F.3d 231, 247 (3d Cir.1998); and *James v. Comm'r*, 899 F.2d 905, 908-09 (10th Cir. 1990)).  Furthermore, modest profits relative to substantial tax benefits are insufficient to imbue an otherwise dubious transaction with economic substance.  *Salina Partnership LP v. C.I.R.* T.C. Memo. 2000-352, 2000 WL 1700928 (2000), citing *Sheldon v. Commissioner*, 94 T.C. 738, 767-768, 1990 WL 69233 (1990); and *Saba Partnership v.. Commissioner*, T.C. Memo.1999-359.  In the case of the

Carson/Reno foreign currency trades, the plaintiff may have gained $51,000.00, but this profit is *de minimis* when compared to over $17,000,000.00 in tax benefits arising from the embedded Reno losses.

This court has endeavored to provide the plaintiffs a full hearing, particularly since they bear the burden of justifying the tax treatment of the Reno losses, to establish that the FOCus steps, particularly the Carson/Reno trades had demonstrable economic purpose, and that the purpose was not merely the creation and purchase of a tax deduction.  Consequently, the plaintiffs have gone to great lengths to demonstrate that there was commercial substance to all the transactions carried out with Bricolage, over and above the 2001 tax benefits, which consisted of the highly successful investment history with Bricolage after January of 2002.  Of course, the court would have to conclude that the FOCus steps and the subsequent successful investment history were parts of one continuing transaction, as the plaintiffs suggest, where each step, from the commencement of the Nevada/Carson/Reno steps, to the consummation of all the investment activity after 2002 would be regarded as part of a greater whole, the primary purpose of which was profit motivated.  *See Higgins v. Smith*, 308 U.S. 473, 476, 60 S.Ct. 355, 84 L.Ed. 406 (1940).  Based on all the foregoing, this court simply cannot do so.

## HOLDING ON THE PROPRIETY OF RECASTING THE FOCus TRANSACTION TO PRODUCE TAX UNDER § 1.701-2

This court finds that the FOCus steps were a series of transactions lacking economic substance and comprising an abusive tax shelter designed to permit an investor such as James Kelley Williams to purchase losses embedded in a tiered

partnership structure and to reduce substantially, if not entirely, his federal tax liability for the 2001 tax year in a manner inconsistent with the intent of subchapter K. *See* Section 1.701-2 of the Income Tax Regulations.

The FOCus steps cannot be viewed by this court as simply part of the subsequent successful investment history with Bricolage. In *Coltec Industries, Inc. v. United States*, 454 F.3d 1340, 1352-54 (Fed.Cir. 2006), the Federal Circuit held that the legitimacy of any transaction for tax purposes is not guaranteed merely because a technical interpretation of the (IRS) Code would support the tax treatment. *Id.* at 1354. Rather, *Coltec* mandates additional scrutiny of the bona fides of a transaction, requiring *independently* that the transaction pass muster under the objective economic substance test. *Id.* at 1355. This court is aware of the Fifth Circuit authority stating that the tax consequences of an *interrelated series of transactions* are not to be determined by viewing each of them in isolation but by considering them together as component parts of an overall plan. *See Compaq Computer Corporation v. Commissioner*, 277 F.3d 778 (5th Cir. 2001)*; Crenshaw v. U.S.,* 450 F.2d 472, 476 (5th Cir.), *cert. denied*, 408 U.S. 923, 92 S.Ct. 2490, 33 L.Ed.2d 333 (1972). However, in this court's view, these decisions make a better case for viewing the taxpayer's activity as one transaction than the instant case. The FOCus plan, as executed through the three-tiered partnerships with the attendant steps, was not interrelated with the Williams' subsequent investment activity with Bricolage. Instead, this court agrees with the IRS that the Focus steps and the subsequent investment activity with Bricolage were separate events, not dependent upon each other, and neither requiring the other to proceed.

Furthermore, the *Coltec* Court clarified that the taxpayer has the burden of

proving that the transaction which gave rise to the tax benefit objectively had economic substance, i.e., was a real transaction structured in a particular way to provide a tax benefit as opposed to a transaction created for tax avoidance purposes. *Coltec*, at 1355. This court is not persuaded that the plaintiffs have carried their burden.

The authority cited above supports this court's conclusion that FOCus, like BOSS, Son of Boss, OPIS, CARDS, BLIPS and other such plans developed by major accounting firms like KPMG, and structured to create artificial losses for tax purposes, lacked validity. The warnings against these types of plans was known to Williams' legal counsel and accountants contemporaneously with the decision to participate in the FOCus steps, especially in light of IRS Notice 2000-44 and the *ACM Partnership* decision. Then, IRS Notice 2002-50 was released just six months after Williams purchased Nevada, a Notice warning specifically against the use of the tiered partnerships, straddle investing, and transitory partners who would engage in the trading required to generate losses. This Notice also warned of the potential penalties that might be imposed. Nevertheless, as previously noted, Williams' attorneys relied on the Arnold & Porter legal opinion date October 11, 2002, to conclude that the FOCus plan was valid.

Therefore, in light of all the foregoing, this court finds the IRS recasting of the FOCus transaction to produce tax pursuant to Section 1.701-2 of the Income Tax Regulations was appropriate. The plaintiffs' claims in the instant case and all the related NCR-Bricolage cases are hereby dismissed.

## THE REASONABLE CAUSE AND GOOD FAITH DEFENSES

***May These Defenses Be Claimed by James Kelley Williams***

James Kelley Williams seeks to have benefit of the *reasonable cause* and the *good faith* defenses in order to avoid the imposition of penalties in the event he is found responsible for failure to pay taxes due and owing on the B.C. Rogers loan recapture in tax year 2001. Williams relies in part on statutory authority which provides that if a taxpayer acts in good faith and with reasonable cause in the calculation of taxes, penalties may not be applied: "[n]o penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." Title 26 U.S.C. § 6664(c)(1).[33]

The plaintiffs' complaints all contend that this lawsuit is a partnership proceeding governed by the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Title 26 U.S.C. §§ 6221-6233. Recently, in the case of *Clearmeadow Investments., LLC v. United States*, 87 Fed. Cl. 509, 521-22 (2009), the Court of Federal Claims declared that the Fifth Circuit's consideration of the reasonable cause and good faith defenses in *Klamath,* and a Court of Federal Claims determination which did the same, *Stobie Creek Investments, LLC v. United States*, 82 Fed.Cl. 636 (2008), were in error because these defenses, set forth in section 6444(c)(1) of Title 26 U.S.C., are unavailable in a

---

[33]Title 26 U.S.C. § 6664(c)(1) provides that, "[n]o penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."

federal tax case conducted at the partnership level. *Clearmeadow* also refers to Treas. Reg. § 301.6221-1(d) and Temp. Treas. Reg. § 301.6221- 1T(c)-(d) to contend that these defenses may not be considered at the partnership level. However, as this court views the matter, *Clearmeadow* simply establishes that there exists a conflict of opinions in the Court of Federal Claims. This conflict does not implicate the Fifth Circuit's decision in *Klamath*. Therefore, this court's obligation to follow the Fifth Circuit's pronouncements of law is not affected by the *Clearmeadow* ruling.

As stated by the Fifth Circuit in *Klamath*, "this issue (of whether the defenses can be asserted by an individual partner) is governed by the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"). Under TEFRA, 'the tax treatment of any *partnership item* and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item shall be determined at the partnership level.' Title 26 U.S.C. § 6221." *Klamath,* 568 F.3d at 547. A "partnership item" is "any item required to be taken into account for the partnership's taxable year ... [that] is more appropriately determined at the partnership level than at the partner level." Title 26 U.S.C. § 6231(a)(3).[34] Partnership items include income, gain, loss, deduction, and/or credit of the partnership. *Jade Trading, LLC v. U.S.*, 80 Fed.Cl. 11, 42 (Fed. Cl. 2007).

Changes in the tax treatment of partnership items may result in changes to the

---

[34]The term "partnership item" means, with respect to a partnership, any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level. Title 26 U.S.C. § 6231(a)(3).

tax returns of individual partners. Changes in the tax liabilities of any individual partner which result from the correct treatment of partnership items determined at the partnership level proceeding are defined under TEFRA as "computational adjustments." Title 26 U.S.C. § 6231(a)(6).[35] Partner-level defenses to any penalty, addition to tax, or additional amount that relates to an adjustment to a partnership item may not be asserted in the partnership-level proceeding, but they may be asserted through separate refund actions following assessment and payment. ... Partner-level defenses are limited to those that are personal to the partner or are dependent upon the partner's separate return and cannot be determined at the partnership level." *See* 26 C.F.R. § 301.6221–1(d)(made final and applicable to partnership taxable years beginning on or after Oct. 4, 2001); *Klamath*, 547-48.

In order to avoid the inefficiency associated with requiring the IRS to audit and adjust each partner's tax return, Congress created a unified partnership-level procedure for auditing and litigating "partnership items." The *Klamath* decision notes that the TEFRA structure enacted by Congress does not permit a partner to raise an individual defense during a partnership-level proceeding such as the instant case.[36] *Klamath*, 568 F.3d at 548; *see also American Boat Company, LLC v. United States*, 583 F.3d 471, 478 (7th Cir. 2009); and *Keller v. C.I.R.*, 568 F.3d 710, 722 (9th Cir. 2009). Instead,

---

[35]The term "computational adjustment" means the change in the tax liability of a partner which properly reflects the treatment under this subchapter of a partnership item. Title 26 U.S.C. § 6231(a)(6).

[36]To avoid the inefficiency associated with requiring the IRS to audit and adjust each partner's tax return, Congress created a unified partnership-level procedure for auditing and litigating "partnership items." See Tax Equity and Fiscal Responsibility Act (TEFRA) of 1982 § 402, 26 U.S.C. §§ 6221-6234

when considering the determination of penalties at the partnership level, this court may consider the defenses of the partnership. *Klamath*, 568 F.3d at 548. Furthermore, TEFRA gives this court jurisdiction over the partnership-level proceedings jurisdiction "to determine all partnership items of the partnership." Title 26 U.S.C. § 6226(f). "A partnership's tax items, which determine the partners' taxes, are litigated in partnership proceedings-not in the individual partners' cases." *River City Ranches # 1 v. C.I.R.*, 401 F.3d 1136, 1144.(9th Cir. 2005). So, a reasonable cause and good faith defense may be considered during partnership-level proceedings if the defense is presented on behalf of the partnership. *Klamath*, at 548, citing *Santa Monica Pictures v. Comm'r*, 89 T.C.M. 1157, 1229-30 (2005) (considering the reasonable cause and good faith defense asserted by the partnership to determine whether accuracy-related penalties should apply); *see also Stobie Creek Investments, LLC v. United States*, 82 Fed.Cl. 636, 703-04, 717-21 (2008) (considering the reasonable cause defense at the partnership level). At the partnership level, managing partners may assert these defenses, but not other partners. *Klamath*, at 548.

In the instant case, the IRS argues that Williams is an individual partner, referred to as the "controlling partner" with final decision making authority, but not a managing partner, and was not responsible for preparing the tax returns for Nevada, Carson and/or Reno. Bricolage's role was as an administrative partner. As is stated in the style of this case, SAPPHIRE II, Inc., is the tax matters partner. The IRS argues that since Williams was not a managing partner, as was the taxpayer in *Klamath*, he cannot assert the reasonable cause and good faith defenses in this partnership level action.

In a recent Tax Court Memorandum, *Tigers Eye Trading, LLC v. Comm'r*, T.C.

Memo.2009-121, 2009 WL 1475159, (U.S.Tax Ct. May 27, 2009), the tax court held

that the individual partner could not interpose any partner-level reasonable cause

defense against an accuracy-related penalty determined at partnership level, citing

*Klamath* and other authorities in agreement with this principle.  However, in a section of

dicta denominated "Afterword," the tax court stated that "[s]eparating parts of a demand

and pursuing it piecemeal; presenting only a part of a claim in one lawsuit, leaving the

rest for a second suit ... has long been considered procedurally impermissible."

Additionally, the tax court noted that, [t]he prohibition against splitting a cause of action

is common law doctrine, citing *Magnolia Petroleum Co. v. Hunt*, 320 U.S. 430, 460-461,

64 S.Ct. 208, 88 L.Ed. 149 (1943)."

The tax court in *Tigers Eye Trading, LLC,* further contended that this policy of

having a partner raise defenses only at the partner level after the partnership's FPAA

determination,

> "makes less sense in Son-of-BOSS transactions and other tax shelters
> sold to multimillionaires, where each partnership usually has no more than
> one or two individuals or family groups as participants.  The new
> procedure ... makes it necessary, in cases in which the partnership-level
> determinations are sustained, to educate two different courts (or at least
> two different judges) in the operation of the same complex set of
> transactions.  One court has the task of determining the validity of the
> FPAA determinations which, if sustained, will lead to deficiency and
> penalty assessments by way of computational adjustments. Another court,
> in a refund suit to recover the penalties, must determine the validity of the
> participating partner's partner-level defenses to those penalties. If the
> partnership-level adjustments should require an affected items
> partner-level proceeding to determine the deficiencies and penalties, three

70

proceedings would be required, because the partner-level defenses to the penalties could not be raised in the affected-items deficiency proceeding."

*Tigers Eye Trading, LLC,* T.C. Memo.2009-121, *26 2009 WL.

The tax court noted that the Commissioner of IRS (the Secretary) has proposed new regulations which might help this circumstance and permit "one-stop shopping," but this court is unable to ascertain that these regulations are available at this time. No party in the instant case has submitted any authority on this matter.

Therefore, based upon the juridical principles currently applicable to this question, this court is required to conclude that James Kelley Williams is not entitled to assert the reasonable cause and good faith defenses at this stage of these proceedings and will be required to raise these arguments and defenses in a partner level action seeking a refund. However, there is one more consideration this court briefly shall address.

### The Small Partnership Exception to TEFRA Not Applicable

Under Title 26 U.S.C. § 6231(a)(1)(B)(i),[37] there is an exception to the application of TEFRA for small partnerships having fewer than 10 partners, each of whom is a United States resident individual, C corporation, or estate of a decedent partner. Under this exception, a partner would be able to raise personal tax matters and defenses.

---

[37]Title 26 U.S.C. § 6231(a)(1)(B)(i) provides that, "[t]he term 'partnership' shall not include any partnership having 10 or fewer partners each of whom is an individual (other than a non-resident alien), a C corporation, or an estate of a deceased partner. For purposes of the preceding sentence, a husband and wife (and their estates) shall be treated as 1 partner."

However, no party in the instant case has submitted any authority or argument on this matter. Moreover, as noted in *Tigers Eye Trading, LLC*, Son-of-BOSS and other such LLC partnerships with fewer than 10 partners, for the most part, do not qualify for the small partnership exception for various reasons. Inasmuch as the parties have not presented authority on this matter, this court shall not investigate it further.

## THE PENALTY ISSUE AT THE PARTNERSHIP LEVEL

As previously discussed, the issue of penalties is governed by TEFRA, 26 U.S.C. § § 6221-6233. Under the Act, "the tax treatment of any partnership item (and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item) shall be determined at the partnership level." Title 26 U.S.C. § 6221. In the instant case, this court has concluded that the FOCus steps conducted through the three-tiered partnership structure of Nevada, Carson and Reno constituted a tax shelter and was only nominally related to the subsequent investment activity conducted by James Kelley Williams through Carson and Bricolage.

The Internal Revenue Code defines a tax shelter as, *inter alia*, an entity or plan or arrangement "if a significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax." Title 26 U.S.C. § 6662(d)(2)(C)(ii); *U.S. v. BDO Seidman, LLP*, 492 F.3d 806, 824 (7th Cir. 2007). The FOCus steps in the instant case had as their sole purpose the use of the partnership structure in hope of eliminating any tax on Williams' B.C. Rogers loan recapture.

Responding to this court's question concerning applicable penalties, the IRS referred to the substantial understatement penalty which provides for a 20 percent penalty for substantial understatement of income tax. Title 26 U.S.C. § 6662(b)(2).

Additionally, this court is aware of a 20 percent penalty for negligence or disregard of rules and regulations.  Title 26 U.S.C. § 6662(b)(1).  The IRS also mentioned the possibility of a 40 percent penalty for a gross valuation misstatement under Title 26 U.S.C. § 6662(b)(3) and (h).  Since there is no stacking of these penalties, the maximum penalty either will be 20 percent or 40 percent of the underpayment of tax.  *Southgate Master Fund, LLC ex rel. Montgomery Capital Advisors, LLC v. U.S.*, --- F.Supp.2d ----, 2009 WL 2634854 (N.D. Tex. 2009).

### *Valuation Misstatement Penalty*

The plaintiffs argue that under *Todd v. Comm'r*, 862 F.2d 540, 541-42 (5th Cir.1988), and *Heasley v. Comm'r*, 902 F.2d 380, 382-83 (5th Cir. 1990), a valuation misstatement penalty is not applicable if the IRS's disallowance of tax benefits is not "attributable to" a valuation misstatement. *See Klamath Strategic Inv. Fund v. United States*, 472 F.Supp.2d 885, 899-900 (E.D. Tex. 2007) *aff'd in part*, 568 F.3d at 553, (which held that a disallowance was not "attributable to" a valuation misstatement when the IRS disallowed a transaction as lacking economic substance).  This court agrees, having concluded that the FOCus program lacked economic substance and served only to generate losses.  So, the valuation misstatement penalty shall not be applied.

### *Substantial Understatement Penalty*

The IRS may impose a penalty for substantial understatement of tax required where the understated amount exceeds 10 percent of the amount required to be shown on a return.  Title 26 U.S.C. § 6662(d)(1)(A)(i).  The ten percent threshold is exceeded in this case.  The Internal Revenue Code generally provides for a 20% penalty for the

"substantial understatement of income tax." Title 26 U.S.C. § 6662(a) & (b).[38] This penalty applies in the instant case.

### *Substantial Authority Reduction Exception*

The penalty may be reduced to the degree "substantial authority" may have existed to support the tax treatment in question. Title 26 U.S.C. § 6662(d)(2)(B)(i) (2002). However, the standard for finding "substantial authority" is "more stringent than the reasonable basis standard." *See* Treas. Reg. § 1.6662-4(d)(2); and *Klamath Strategic Inv. Fund, LLC v. United States*, 472 F.Supp.2d 885 F.Supp. 885, 900 (E.D. Tex. 2007), *aff'd sub nom. Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537 (5th Cir. 2009); *Southgate Master Fund, LLC ex rel. Montgomery Capital Advisors, LLC v. U.S.*, --- F.Supp.2d ----, 2009 WL 2634854 (N.D. Tex. 2009). The exception may exist where "the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment." Treas. Reg. § 1.6662-4(d)(3)(i); *see also Custom Chrome, Inc. v. Comm'r*, 217 F.3d 1117, 1127-28 (9th Cir. 2000).

---

[38]Title 26 U.S.C. § 6662(a) & (b) provide that, "[i]f this section applies to any portion of an underpayment of tax required to be shown on a return, there shall be added to the tax an amount equal to 20 percent of the portion of the underpayment to which this section applies.

Subsection (b) provides that, "[t]his section shall apply to the portion of any underpayment which is attributable to 1 or more of the following: (1) Negligence or disregard of rules or regulations; (2) Any substantial understatement of income tax; (3) Any substantial valuation misstatement under chapter 1; (4) Any substantial overstatement of pension liabilities. (5) Any substantial estate or gift tax valuation understatement.

This section shall not apply to any portion of an underpayment on which a penalty is imposed under section 6663. Except as provided in paragraph (1) or (2)(B) of section 6662A(e), this section shall not apply to the portion of any underpayment which is attributable to a reportable transaction understatement on which a penalty is imposed under section 6662A.

In the instant case, this court is persuaded that the weight of contemporaneous authorities instructed against the formation of Nevada, Carson and Reno for the purposes of generating losses to offset taxable gains. In this court's foregoing factual findings and analysis, virtually no authority supported the KPMG recommendation to follow the FOCus steps in order to reduce or eliminate taxation of the B.C. Rogers related recapture. Williams' advisers have been shown by the evidence in this case to have been aware of IRS efforts to combat abusive tax shelters that called the partnerships' decision to proceed into question. By the time KPMG filed Williams' 2001 tax returns, they knew that the IRS was investigating KPMG for tax shelter transactions, as well as investigating similar transactions involving other accountants and taxpayers. John Beard e-mailed concerns to KPMG about section 6662 penalties and how similar the FOCus transaction was to those transactions described in Notice 2000-44. Therefore, this court finds that the understated income tax liability in this case requires imposition of the 20-percent (20%) penalty under Title 26 U.S.C. § 6662(a).

### Negligence and Disregard of the Rules

Title 26 U.S.C. § 6662(c) provides that "the term 'negligence' includes any failure to make a reasonable attempt to comply with the provisions of this title, and the term 'disregard' includes any careless, reckless, or intentional disregard." Section 1.6662-3(b)(1)(ii), Income Tax Regs., provides that negligence is strongly indicated where "a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances."

The IRS has argued that the FOCus steps were "too good to be true" and

required greater scrutiny on the part of the plaintiffs, all taxpayers who are sophisticated business persons and investors. This court already has noted that Williams' advisers were aware of the IRS notices, ultimately the investigation of KPMG, as well as the general IRS position concerning transactions similar to the one at issue. The partnerships yet chose to proceed with the FOCus steps and generate the embedded losses in Reno, while Williams chose to rely on the legal opinion of Arnold & Porter instead of taking greater heed of the IRS notices.

The partnerships, as well as Williams, filed their respective returns well after the IRS issued Notice 2000-44 and were aware of recent developments in this area of tax law. This tax court decision in *New Phoenix Sunrise Corp. v. C.I.R.*, 132 T.C. No. 9, 2009 WL 960213 (U.S.Tax Ct. 2009), quoted *Neonatology Associates, P.A. v. Commissioner*, 299 F.3d 221, 234 (3d Cir. 2002) as follows: "[a]s highly educated professionals, the individual taxpayers should have recognized that it was not likely that by complex manipulation they could obtain large deductions for their corporations and tax free income for themselves."

Therefore, this court concludes that the twenty percent (20%) negligence penalty under Title 26 U.S.C. § 6662(b)(1) applies. *Stobie Creek*, 721; *Jade Trading, LLC*, 82 Fed. Cl. at 57. As earlier stated, no stacking of these penalties is permitted.

### The Reliance Defense

In the argument against imposition of a penalty in this instance, the partnerships certainly would join any argument made by Williams that he took care to obtain the advice of three respected firms, KPMG, Arnold & Porter, and his attorneys. Reliance on professionals can be viewed as sufficient due diligence under Treas. Reg. § 1.6664-

4.  *See Chamberlain v. Comm'r*, 66 F.3d 729, 733 (5th Cir. 1995);  *United States v. Boyle*, 469 U.S. 241, 251 (1985); and *Heasley v. Comm'r*, 902 F.2d 380, 384-85 (5th Cir. 1990) (explaining that "due care does not require moderate-income investors ... to independently investigate their investments[, because] [t]hey may rely on the expertise of their financial advisors and accountants").   However, reliance on professionals must be reasonable in light of the circumstances. Treas. Reg. § 1.6664-4(b)(1), (c)(1); *Stobie Creek Invs.*, 82 Fed.Cl. at 717.  In *Klamath* the district court stated that reasonableness was a fact-specific determination with many variables, and that the question "turns on 'the quality and objectivity of the professional advice obtained.'"  *Klamath Strategic Inv. Fund, LLC v. United States*, 472 F.Supp.2d 885, 904 (E.D.Tex. 2007), *aff'd sub nom. Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537 (5th Cir. 2009) (quoting *Swayze v. United States*, 785 F.2d 715, 719 (9th Cir. 1986)). At a minimum, the taxpayer must show that the advice was (1) based on all relevant facts and circumstances, meaning the taxpayer must not withhold pertinent information, and (2) not based on unreasonable factual or legal assumptions, including those the taxpayer knows or has reason to know are untrue. Treas. Reg. § 1.6664-4(c)(1); *see also Stobie Creek Invs.*, 82 Fed Cl. at 717-18.  Other relevant considerations are the taxpayer's education, sophistication, business experience, and purposes for entering the questioned transaction. Treas. Reg. § 1.6664-4(c).

In light of all the foregoing factual findings and analysis in this case, this court is persuaded that the plaintiffs were superbly educated, experienced and sophisticated investors who made certain factual and legal assumptions about what could be accomplished through the FOCus program, assumptions which were not borne out by

more competent and reliable authoritative sources.  Thus, the defense of reliance on professional advice does not, in this court's view, relieve the partnerships of their liability for penalties in this case for substantial understatement and for negligence.

## CONCLUSION

Based on the holdings presented above, this court finds that the final partnership administrative adjustments setting forth adjustments to the partnership tax returns for the taxable year ending December 31, 2001, were proper.  Therefore, the complaints of the plaintiffs in the instant case and the member cases numbered 3:06-cv-00384-HTW-MTP;  3:06-cv-00385-HTW-MTP;  3:06-cv-00386-HTW-MTP;  3:06-cv-00387-HTW-MTP;  3:06-cv-00380-HTW-MTP;  3:06-cv-00381-HTW-MTP;  3:06-cv-00382-HTW-MTP;  3:06-cv-00388-HTW-MTP;  3:06-cv-00389-HTW-MTP; and 3:06-cv-00390-HTW-MTP are hereby dismissed with prejudice.  A separate judgment under Rule 58 of the Federal Rules of Civil procedure shall be entered by the court.

**SO ORDERED AND ADJUDGED** this the 30th day of April, 2010.

**s/ HENRY T. WINGATE**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

Civil Action No. 3:06-cv-379 HTW-MTP (lead case)
Member Cases:
      3:06-cv-384 HTW-MTP
      3:06-cv-385 HTW-MTP
      3:06-cv-386 HTW-MTP
      3:06-cv-387 HTW-MTP
      3:06-cv-380 HTW-MTP
      3:06-cv-381 HTW-MTP
      3:06-cv-382 HTW-MTP
      3:06-cv-388 HTW-MTP
      3:06-cv-389 HTW-MTP
      3:06-cv-390 HTW-MTP
Memorandum Opinion and Order